UNITED STATES, Appellee,

v.

**José Luis LOZADA–RIVERA**
**a/k/a Sealed Defendant 1,**
**Defendant, Appellant.**

No. 98–1351.

United States Court of Appeals,
First Circuit.

Heard April 6, 1999.

Decided May 27, 1999.

Francisco Rebollo–Casalduc, with whom Nachman, Guillemard & Rebollo, was on brief for appellant.

Louis M. Fischer, Attorney, United States Department of Justice, with whom Guillermo Gil, United States Attorney, was on brief for appellee.

Before Lynch, Circuit Judge, Bownes, Senior Circuit Judge, and Lipez, Circuit Judge.

BOWNES, Senior Circuit Judge.

Defendant-appellant José Luis Lozada–Rivera ("Lozada") challenges his criminal conviction for conspiracy to distribute cocaine and possession of cocaine with intent to distribute. He raises several issues on appeal, including asserted defects in the trial court's evidentiary rulings and its instructions to the jury.[1] We address only

---

1. In particular, he asserts that: (1) the trial court should have granted him free rein to introduce certain evidence accounting for his seemingly extravagant expenditures; (2) the government should not have been allowed to impeach him (and others) with prior arrests and convictions; (3) the jury should have been given defendant's suggested instruction as to character evidence; and (4) the government withheld material exculpatory evidence. Because we decide he deserves a new trial on

two of his weightiest claims: that the trial judge erred in admitting into evidence a federal agent's report containing his version of apparently incriminating statements made by defendant during a post-arrest interview; and that the court improperly permitted a government witness to testify that Lozada had recently asked him to alter his testimony. We reverse and remand for a new trial on both scores.

The court should not have allowed the jury to consider the contents of the report, either for the truth of the matter asserted therein or for a more limited rehabilitative purpose. And, as the government now concedes, the court should not have permitted testimony about Lozada's jailhouse remarks elicited in violation of his Sixth Amendment right to counsel. We conclude that neither of these errors was harmless.

## I

On February 19, 1997, a federal grand jury indicted Lozada and three others on one count of conspiracy to traffic cocaine, 21 U.S.C. § 846, and four counts of possession with intent to distribute, 21 U.S.C. § 841(a)(1). His fellow co-defendants pled out before trial; Lozada opted to take his chances with a jury of his peers.

During the course of his nine-day trial in September 1997, the government introduced substantial evidence of a scheme to transport several hundred kilograms of cocaine from Puerto Rico to the New York metropolitan area. The evidence established that the drug trafficking operation, with a few minor variations, worked in the following manner: Members of a transportation group received the cocaine from Colombian suppliers in Puerto Rico and delivered it to a warehouse owned by Lozada. Once at the warehouse, they would elaborately repackage the cocaine by concealing it in cargo containers containing corn oil, coconuts, syrup, and other food stuff. The

narcotics were then smuggled to New York masked as legitimate products.

Jairo Rodríguez–Zuluaga ("Rodríguez"), who served as the liaison between the transportation group and the Colombian suppliers, would usually assist in the repackaging process and then travel to New York to receive the shipment. The conspirators later met in a hotel in New Jersey to be paid for their labor. This entire process was repeated several times between 1994 and 1996. The responsible parties transported some 100–800 kilograms of cocaine from Puerto Rico to New York in this fashion.

The government advanced a theory of the case according to which Lozada and Carlos Rosario–Matos ("Rosario") jointly headed the transportation group and, after Rosario's arrest in 1995, Lozada assumed full control of the unit. As the government's witnesses told it, for each shipment Lozada secured the necessary cargo containers, prepared the shipping paperwork (listing "Loíza Foods" as the putative shipping company), and purchased the legitimate items ultimately used to fill the containers and conceal the cocaine. Lozada operated Las Vegas Brands, Inc., a food products import-export company based in Puerto Rico, whose supplies and property were used for the repackaging activities of the transportation group. The prosecutor tendered other circumstantial evidence of Lozada's guilt: he made certain suspiciously large cash deposits into his business account, kept sizeable sums of cash nearby, and made seemingly extravagant expenditures for a person of relatively modest means.

Three cooperating witnesses tied Lozada to the conspiracy (a fourth stated that he saw Lozada at a meeting where the elements of the scheme were discussed). Rosario, who originally established contact with the Colombian suppliers on his own, testified that Lozada got involved after the first shipment, and that he thereafter

other grounds, we have no occasion to reach the merits of these claims.

shared half his profits from future shipments with Lozada.

Rodríguez, the go-between, stated that he saw Lozada, who he knew as "Don Millin," present at repackaging sessions and that Lozada showed up to get paid on at least one occasion. Abelardo Torres–Padilla ("Torres"), too, placed Lozada in the general vicinity of the warehouse when the cocaine was being placed in the containers, and claimed that he informed Lozada by telephone that a July 1995 shipment had been seized by Customs agents. Over strong objections by the defense, Torres also testified that the night before he was to take the stand, Lozada offered him money if he would change his testimony (the two were housed in the same detention facility).

The centerpiece evidence of Lozada's involvement in the conspiracy, however, were certain incriminating statements allegedly uttered by Lozada on the day of his arrest when he initially opted to cooperate with the authorities. The government urged the jury to view these comments purportedly made in the presence of federal law enforcement officers, including Drug Enforcement Agency ("DEA") Agent Rafael E. Rodríguez ("Agent Rodríguez"), as a "confession." Agent Rodríguez was the only witness to testify at trial that Lozada incriminated himself. He was cross-examined by the defense. Then, at a critical juncture in the proceedings and on redirect, the prosecution offered a detailed typewritten report ostensibly to repair Agent Rodríguez's credibility. This report paraphrased a series of damaging statements allegedly made by Lozada, thereby buttressing the agent's oral testimony. Again over defendant's objections, the court accepted this evidence.

Taking the stand in his own defense, Lozada testified that he had met some of the principals in the alleged conspiracy under completely innocent circumstances. He also acknowledged that he sometimes allowed Rosario, his long-time friend, to use his warehouse for storage space, but denied actively participating in a drug trafficking conspiracy. He vehemently denied making any incriminating statements to government agents after his arrest. His nephew took the stand and said that he had, on occasion, prepared paperwork on Rosario's behalf using the shipping name "Loíza Foods." Other witnesses attested to Lozada's reputation for truth-telling.

On September 22, 1997, after a few hours of deliberation, the jury convicted Lozada on all counts. The court subsequently sentenced him to 210 months of imprisonment followed by five years of supervised release, after departing downward from the applicable sentencing guideline range based on his advanced age and significant physical ailments. Lozada filed a timely appeal.

**II**

 We lead off with the issue of whether the trial court erred by accepting the DEA report into evidence. During the government's case-in-chief, Agent Rodríguez testified that Lozada made certain incriminating comments during a post-arrest interview on March 4, 1997. According to Agent Rodríguez, Lozada admitted his role in the conspiracy and explained his actions in furtherance of its objectives.

During cross-examination, defense counsel established that the interview had not been tape-recorded or videotaped. He then asked Agent Rodríguez to confirm that he had once lived in Lozada's neighborhood and attended school with his children, and inquired whether he had anything against Lozada or his family. Agent Rodríguez answered in the negative, and counsel pressed no further.[2]

---

2. The entire exchange consisted of the following:

 Q. Agent Rodríguez, where are you from?
 A. From Naranjito.
 Q. Next to Corozal.
 A. Yes, sir.
 Q. In fact, you were a neighbor all your life of Mr. Lozada.

On redirect, the government sought to introduce a formal report prepared by Agent Rodríguez in which he recounted his version of Lozada's alleged comments during the March 4, 1997 interview, to rebut what it believed to be a charge of improper motive made during defense counsel's examination.[3] The DEA report characterized the discussion as marked by defendant's willingness to "talk about the events that led to his involvement in drug trafficking activities," and ascribed to Lozada certain admissions revealing his awareness of crucial details of the drug trafficking ring, including the method of smuggling the cocaine and his familiarity with key players in the scheme. Agent Rodríguez apparently completed the report a day or two after the actual interview based on contemporaneous notes he had taken during the conversation, which have since been destroyed.[4] The government explicitly "offered [the report] under Fed. R.Evid. 801(d)" to "rebut the attack on his credibility."

Defense counsel objected, saying that the contents of the report were overly prejudicial and constituted inadmissible hearsay. The district court overruled defendant's objections and allowed the report into evidence, ruling that it was admissible to rebut Lozada's implied charge of improper motivation because counsel "went into the motive by saying he [the agent] was in the same school, that he knew the family." The court instructed the jury that the report had been received solely for the purpose of "weighing the credibility of [Agent Rodríguez]."

At a subsequent point in the trial, after Lozada himself took the stand and denied making incriminating remarks to Agent Rodríguez, the government moved the court to accept another copy of the report into evidence (the previous one apparently had a few parts excised). The trial court did so, calling the jury's attention to the DEA report anew. This time, the judge instructed the jury that the report could be used to assess "the credibility of this witness [Lozada]" in addition to "the credibility of the agent testifying on that matter," and "to give the weight that [the

A. No.
Q. You weren't?
A. No, sir.
Q. Where did you go to school?
A. In Naranjito.
Q. Santa Teresita?
A. Just for ninth grade.
Q. Any relatives of Mr. Lozada go to school there with you?
A. Yes, sir.
Q. Who?
A. Mr. Lozada's son.
Q. And the daughter.
A. Well, I don't remember about Mildred.
Q. But you seem to call her by her first name.
A. Yes, sir.
Q. Isn't it a fact, sir, that you have known Mr. Lozada and his family since back in your high school years, sir?
A. Well, it wasn't until the day of the arrest that I remembered Emilio and my studying with him, because he was really fat and I didn't remember him.
Q. You didn't socialize with the children of Mr. Lozada in your younger years?
A. At that time we were together in the same ninth grade classroom, but nothing more.

Q. Didn't you date a friend of Mildred Lozada and double date with her?
A. I don't know, I don't remember. If you can tell me, because I don't remember.
Q. How old a man are you, sir? How old are you?
A. Thirty-seven.
Q. And you never had a problem with the Lozada family during those years, did you?
A. No, not that I remember.

3. The report was prepared on an official Department of Justice form, titled "Report of Investigation." Substantively, it briefly describes the pre-interview cautionary steps taken by the federal agents, such as advising Lozada of his rights, and paraphrases in great detail Lozada's alleged statements. Each detailed paragraph begins: "Lozada–Rivera stated that...." "Lozada–Rivera admitted that ..." or "Lozada–Rivera explained that...."

4. The three-page report indicates that it was prepared on March 5, 1997, but was not signed by Agent Rodríguez and his Group Supervisor until March 20, 1997.

jurors] think it deserves, if any, *to the testimonies.*" (Emphasis added). Lozada renewed his previous objections, to no avail.

On appeal, Lozada contends that the trial judge misapplied Rule 801(d)(1)(B). He argues that his cross-examination did not open the door to introduction of the report. Citing *Tome v. United States,* 513 U.S. 150, 115 S.Ct. 696, 130 L.Ed.2d 574 (1995) (prior consistent statement may not be admitted under Rule 801(d)(1)(B) unless it antedates alleged motive), he further argues that even if his questioning opened the door, the report could not be used to refute an implied charge that Agent Rodríguez may have disliked Lozada or his family because it was prepared well after the purported bias arose. In response, the government maintains that the court properly received the report for credibility purposes, not for the truth of its contents. Citing a long line of cases spanning several circuits, it says that the court's evidentiary ruling had firm support in the doctrine of rehabilitation.

■ We scrutinize the trial court's evidentiary ruling for an abuse of discretion. *See United States v. Reeder,* 170 F.3d 93, 107 (1st Cir.1999). Our analysis is initially complicated by a certain degree of ambiguity as to how the report was actually used at trial. Lozada directs our attention to certain points in the record suggesting that the report, in fact, was considered for the truth of the matter asserted. Specifically, he insists that counsel for the government improperly argued the contents of the report to the jury in his rebuttal argument at the close of trial. We observe, in addition, that the trial judge seemed to tell the jurors on at least one occasion that they could use the substance of the report to evaluate defendant's credibility.

For its part, the government points out that, notwithstanding its reference to Rule 801(d)(1)(B), the trial court characterized its ruling as accepting the report only for credibility; accordingly, it specifically instructed the jury repeatedly not to consider the report for the truth of the matter. The government leans heavily on the doctrine of rehabilitation and ignores Rule 801(d)(1)(B) almost entirely.

This confusion is somewhat understandable due to the as yet unresolved legal dilemma concerning the extent to which the Rule altered preexisting common law standards governing rehabilitative use of prior statements. It is a matter of some debate whether Rule 801(d)(1)(B) controls prior consistent statements of all stripes or whether a more relaxed test applies when a prior statement is offered for a rehabilitative purpose. *Compare United States v. Miller,* 874 F.2d 1255, 1273 n. 12 (9th Cir.1989) ("There is … no class of prior consistent statements, offered for purposes of rehabilitation, that does not fall within the literal scope of Rule 801(d)(1)(B).") *with United States v. Pierre,* 781 F.2d 329, 333 (2d Cir.1986) (irrespective of Rule 801(d)(1)(B), prior consistent statement offered to rehabilitate a witness is subject only to condition that it "has a probative force bearing on credibility beyond merely showing repetition.").

We need not settle on precisely how these elements (*i.e.,* Rule 801(d)(1)(B), *Tome,* and the common law notion of rehabilitation) fit together. The uncertainty does not materially alter the calculus in the case at bar because the trial judge erred in his threshold determination that defense counsel's examination of Agent Rodríguez opened the door to the report. This determination is a necessary precondition for admission of a prior statement under the Rule or based on any other rehabilitative ground, and the government failed to satisfy it.

For the most part, defense counsel's cross-examination of Agent Rodríguez was a routine affair, remarkable only for its brevity and relative restraint. The only arguable suggestion of improper motive on the part of Agent Rodríguez came near the end of a meandering line of questioning

that ultimately bore no fruit: counsel asked a series of questions probing whether Agent Rodríguez might bear some ill will toward Lozada's family because he had once lived in Lozada's neighborhood and attended school with his children. This was a weak innuendo at best, as any interaction between Agent Rodríguez and Lozada's family occurred in the distant past; he knew Lozada's children in the ninth grade, and he was 37 years old when he testified. More important, Agent Rodríguez denied ever having a problem with Lozada or any member of his family, and Lozada did not test this denial with even a single concrete example tending to show actual bias. Discovering nothing, he simply moved on.

■ We do not see how this attenuated suggestion of improper motive paved the way to rebuttal by way of the official report. While we accord deference to a trial court's finding as to whether counsel has implied during his questioning that a witness has a motive to fabricate, *see United States v. Piva*, 870 F.2d 753, 758 (1st Cir.1989), that deference is not absolute—there must be record support for such a finding. Generally speaking, a charge of improper motive or recent fabrication need not be expressly made or buttressed by concrete evidence. But the proponent of evidence must point to specific questions during his adversary's examination that suggest recent fabrication or bias. Merely appealing to credibility as a live issue will not do the trick. *See Thomas v. United States*, 41 F.3d 1109, 1119 (7th Cir.1994) ("One may impeach for lack of credibility without going so far as to charge recent fabrication.").

There are occasions when a theory of bias is so implausible and the corresponding suggestion of contrivance so weak that the line of questioning would not even qualify as an implicit charge of improper motivation. *See Christmas v. Sanders*, 759 F.2d 1284, 1288 (7th Cir.1985) (theory was "too attenuated to support any inference of an implied charge of recent fabri-

cation"); *see also Casoni*, 950 F.2d at 904 (while the bar is not high, the clear implication must be that the witness "consciously altered his testimony"); *Breneman v. Kennecott Corp.*, 799 F.2d 470, 473 (9th Cir.1986) ("Mere contradictory testimony cannot give rise to an implied charge of fabrication."). So it is here. Any suggestion that prior contact with defendant's family rendered Agent Rodríguez biased was strained at best, and certainly should not have been dispelled by admitting an official document containing highly prejudicial information.

From our review of the record, it is also apparent that the trial court deemed the report relevant to aid the jury's assessment of Agent Rodríguez's credibility and later broadened its use to include evaluation of Lozada's credibility as well. It is difficult to escape the conclusion that the DEA report was thrown into the mix to assess the crucial witnesses's credibility *generally*, without either explicit or meaningful limitation. This was improper.

■ We wish to stress that the report should not have been used to assess the credibility of Lozada, which the judge encouraged the jury to do upon the conclusion of the government's examination. We see absolutely no reason for such a use of the report—indeed, it may have been tantamount to an invitation to use the report as substantive evidence. How else could the report bear on Lozada's credibility (he did not author the report) unless a factfinder compared the details of the report with Lozada's in-court testimony in a way that accepted both for the truth?

■ Having concluded that the report was erroneously admitted into evidence, we must next decide whether the mistake requires reversal of defendant's conviction. In order to deem the defect non-reversible, we would have to say "with fair assurance ... that the judgment was not substantially swayed by the error." *United States v. Gaines*, 170 F.3d 72, 82 (1st Cir.1999) (quoting *Vincent v. Louis Marx & Co.*, 874

F.2d 36, 41 (1st Cir.1989)); *see also* Fed. R.Crim.P. 52(a).

The government bears the burden of demonstrating that the outcome would likely have been the same but for the miscue. Here, it has expressly conceded that if the district court erred by receiving the report, the mistake was sufficiently prejudicial as to warrant a new trial. The government did not argue in its brief that this kind of error could have been harmless under the present fact-scenario. When queried at oral argument, it acknowledged that defendant would be entitled to a new trial if we concluded that the report was erroneously received into the record. We wholeheartedly concur, and commend the government for its forthrightness.[5]

We add only this thought: Although the DEA report largely tracked Agent Rodríguez's own in-court testimony, it essentially provided the jury with an authoritative "condensation of the government's whole case against the defendant." *United States v. Quinto*, 582 F.2d 224, 236 (2nd Cir.1978). That this official report contained damning admissions attributed to Lozada and that it followed the jurors into the jury room are enough to establish that defendant was adversely affected. *See, e.g., United States v. Pendas–Martinez*, 845 F.2d 938, 941 (11th Cir.1988) (erroneously admitted Coast Guard report summarized essential facts of government's case); *United States v. Brown*, 451 F.2d 1231, 1234 (5th Cir.1971) (prejudice entailed where detailed report and handwritten notes constituted brief recap of crucial aspects of government's case and "accompanied the jury into the jury room").

Because the trial court erroneously permitted the government to use the DEA report in its redirect inquiry and admitted that report into evidence, thereby allowing the jurors to evaluate the substance of the report and give it effect in determining the defendant's credibility, we cannot fairly characterize the mistake as a harmless one. Lozada is entitled to a new trial.

### III

■ We also hold that the district court committed reversible error which deprived Lozada of his Sixth Amendment right to counsel. Over defense counsel's objections, the trial judge allowed Torres, a cooperating witness, to testify as to a jailhouse conversation he had with Lozada the night before he was scheduled to take the stand. Among other things, Torres claimed that Lozada offered him a financial inducement to alter his testimony at trial.[6]

---

**5.** There might be some disagreement in our decisions as to the proper standard for harmless error review when a witness's prior statement should not have infiltrated the proceedings. *Compare Awon*, 135 F.3d at 101 (utilizing, without discussion, harmless beyond a reasonable doubt test for erroneous application of Fed.R.Evid. 801(d)(1)(B)) *with United States v. Rose*, 104 F.3d 1408, 1414 (1st Cir.) ("In the usual case, a non-constitutional evidentiary error will be treated as harmless if it is highly probable that the error did not contribute to the verdict."), *cert. denied*, 520 U.S. 1258, 117 S.Ct. 2424, 138 L.Ed.2d 187 (1997). Where material raises potential Confrontation Clause problems, we have employed the more rigorous test. *See, e.g., United States v. Palow*, 777 F.2d 52, 57 (1st Cir.1985) (applying stricter test to hearsay). We need not conclusively resolve this apparent discrepancy because even under the standard more favorable to the government the admission of the report was not harmless.

**6.** The examination proceeded as follows:
Q. And what did Mr. Lozada say to you?
A. When he approached me, when he came near, he asked whether it was me. I told him yes, that it was me. And he told me that he knew I was coming here today. I told him yes, that I was, that I had told him so on Monday, and that on Monday I had been here. And he made a comment to me as to whether I could state here that I bought the oil container behind his back. I told him that I could not; that the police knew already about it; that I coming here to state—to say the full truth. So I again advised him whether he had spoken clearly with his attorney, whether he had told the truth to his attorney, and he told me that if he got ten years, it would be the same as getting 100. That's all.

During a heated exchange at sidebar, defense counsel pointed out that Lozada was represented by counsel at the time of the conversation, contended that admission of his alleged jailhouse comments would be extremely prejudicial, and claimed that he had been sandbagged by this new evidence. He later renewed his objection and asked that Torres's testimony be stricken from the record, arguing in greater detail that these statements had been extracted contrary to Lozada's Sixth Amendment right to counsel. After asking the government a single question—whether counsel was aware of any "contacts [its agents] were trying to make between defendant and any other witness in this case" and receiving an answer in the negative—the court denied the motion.

■■■■ Under the rule of *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), the government may not use a defendant's words against him at trial if those words "were deliberately elicited from him after he had been indicted and in the absence of his counsel." *Id.* at 206, 84 S.Ct. 1199. From the critical moment the right to counsel attaches onward, the Sixth Amendment imposes on government agents "an affirmative obligation to respect and preserve the accused's choice to seek th[e] assistance" of counsel. *Maine v. Moulton*, 474 U.S. 159, 171, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985). The controlling test is whether the government agent "intentionally creat[ed] a situation likely to induce [a defendant] to make incriminating statements without the assistance of counsel." *United States v. Henry*, 447 U.S. 264, 274, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980). That the government does not explicitly instruct a cooperating witness to procure incriminating statements does not always defeat a *Massiah* claim, for conduct by an individual may in certain circumstances be imputed to the government even where it has not affirmatively directed the person to interrogate the defendant. *See id.* (defendant's alleged statements wrongly admitted even though informant was specifically instructed not to initiate conversation but was simply told to "be alert to any statements" made by defendant); *Hancock v. White*, 378 F.2d 479 (1st Cir.1967) (holding that *Massiah* can be violated even though statements were procured without any trickery or subterfuge).

There is no question that Lozada's right to counsel had attached by the time of his jailhouse conversation with Torres. In the typical case, the central controversy is over whether certain statements were deliberately elicited or whether they were spontaneously volunteered, always a fact-intensive inquiry. Where the witness acts only as a "passive listening post," permitting a jury to consider the overheard statements might not trample a defendant's right to counsel. *See Kuhlmann v. Wilson*, 477 U.S. 436, 459, 106 S.Ct. 2616, 91 L.Ed.2d 364 (1986) ("[T]he Sixth Amendment is not violated whenever—by luck or happenstance—the State obtains incriminating statements from the accused after the right to counsel has attached") (quoting *Moulton*, 474 U.S. at 176, 106 S.Ct. 477); *Henry*, 447 U.S. at 276, 100 S.Ct. 2183 ("*Massiah* does not prohibit the introduction of spontaneous statements that are not elicited by governmental action") (Powell, J., concurring). The underlying rationale is that in such a scenario a defendant should not be rewarded—and the government penalized—for spilling the beans. We bypass this usual analysis here.

In this instance, the government has expressly conceded on appeal that Torres

---

Q. Did he mention anything to you about assisting you economically?
A. Yes. I became upset because while he still owed me some money, when I came down I tried to collect from him and he told me that he had spent a lot on attorneys.

And then yesterday he comes up to offer me money, and I told him no.
Q. He offered you money for what, sir?
A. I don't know if it was for me to lie, but I told him that I would not lie.

"deliberately elicited" the incriminating jailhouse statements from Lozada[7] and that Torres was a government agent for purposes of our *Massiah* analysis.[8] It argues only that the error was harmless given the weight of the evidence against him.

 We strongly disagree that admission of these statements was harmless. Constitutional error of this nature is harmless only if it can be said "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *see Milton v. Wainwright*, 407 U.S. 371, 377–78, 92 S.Ct. 2174, 33 L.Ed.2d 1 (1972) (applying reasonable doubt standard to assess effect of *Massiah* violation). This attempt to ascertain the probable impact of the error requires us to weigh the quantum of the government's evidence of guilt against the inherent gravity of the miscue.

The government tendered substantial evidence pointing toward Lozada's guilt. Several witnesses testified that he played a prominent role in the transportation unit, and this testimony and documentary evidence also revealed seemingly suspicious circumstances casting a pall on his protestations of innocence. The prosecution's case was not, however, so one-sided that we can fairly say that the damaging testimony provided by Torres had little or no effect on the jury's decision. In addition, the harmless error test is more stringent where an error of constitutional dimension has infected the trial. The government cannot surmount this obstacle.

The government urges us to conclude that the constitutional error likely had a *de minimis* effect because Lozada supposedly asked Torres to shade his testimony only as to one particular transaction, the implication being that evidence that defendant selectively tampered with a witness did not necessarily taint the entire proceedings.

This argument grossly underestimates the impact of the jailhouse statements attributed to Lozada. In all likelihood, the mere suggestion that Lozada asked—or even worse, that he tried to bribe—a material witness (and alleged co-conspirator) to alter his testimony the night before he was to testify destroyed Lozada's credibility, for a jury would reasonably presume that an innocent man would have no reason to ask a witness to shade his testimony. Put another way, this bit of evidence strongly tended to show that a guilty mind was at work. Once heard, it could well have become the colored lens through which the jury viewed all of the other evidence.

***Reversed and remanded for a new trial. So ordered.***

---

7. While we will not speculate as to the government's reason for strategically abandoning the first two prongs of the *Massiah* test, we note that Torres himself testified that he had sent messages to Lozada "every day as to whether he can come over to the door" and engage in conversation. In fact, Torres even said at one point that he had "advised" Lozada to plead guilty or he would have to testify against him. On the face of the cold record (there was no detailed hearing due to the manner in which the issue arose), there appears to have been more than *de minimis* jailhouse contact between the two. Further, there is no dispute that Torres's actions are imputed to the government because he had successfully negotiated a cooperating witness agreement by this time.

8. The government's brief is somewhat confused on this matter. It first states that the government "assume[s] *arguendo* that Torres violated appellant's Sixth Amendment right to counsel," but later says that it "does not dispute that the testimony in question was wrongly admitted," Gov't Br. at 21, and makes no effort at all to defend the trial court's ruling by arguing that the statements were not deliberately elicited by a government agent. At oral argument, the government clarified that it was, in fact, arguing only the harmless error point.