# United States Court of Appeals
## For the First Circuit

No. 17-2092

UNITED STATES OF AMERICA,

Appellee,

v.

ANTONIO M. FREITAS,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]

Before

Torruella, Thompson, and Barron,
Circuit Judges.

Phillip N. Beauregard, with whom Law Offices of Beauregard, Burke & Franco was on brief, for appellant.
Mark T. Quinlivan, Assistant United States Attorney, with whom Andrew E. Lelling, United States Attorney, was on brief, for appellee.

September 6, 2018

**THOMPSON**, <u>Circuit Judge</u>.

## PREFACE

Antonio Freitas stands convicted of bulk-cash smuggling and currency structuring, in violation of 31 U.S.C. §§ 5332(a) and 5324(c).[1] Freitas believes we must vacate his convictions because, according to him, the district judge quadruply erred — first by admitting certain statements under the coconspirator exception to

_____

[1] Subpart (a)(1) of section 5332(a), the bulk-cash-smuggling statute, punishes anyone who,

> with the intent to evade a currency reporting requirement under section 5316, knowingly conceals more than $10,000 in currency or other monetary instruments on the person of such individual or in any conveyance, article of luggage, merchandise, or other container, and transports or transfers or attempts to transport or transfer such currency or monetary instruments from a place within the United States to a place outside of the United States . . . .

The cross-referenced provision, 31 U.S.C. § 5316, generally requires that "a person or an agent or bailee of the person . . . file a report . . . when [he] knowingly . . . transports, is about to transport, or has transported, monetary instruments" over "$10,000 at one time . . . from a place in the United States to or through a place outside the United States" (the statute's description of the required report is irrelevant for our purposes). And subpart (a)(2) of the bulk-cash-smuggling statute makes clear that "concealment of currency on the person of any individual includes concealment in any article of clothing worn by the individual or in any luggage, backpack, or other container worn or carried by such individual."

Section 5324(c), the currency-structuring statute, prohibits a person from "structur[ing] . . . any importation or exportation of monetary instruments" for the purpose of "evading" section 5316's reporting requirements. Section 5324(c) covers those who "structure or assist in structuring, or attempt to structure or assist in structuring."

- 2 -

the hearsay rule; next by instructing the jury that the government can prove the concealment element of the bulk-cash-smuggling charge through evidence of structuring, an instruction that wrongly removed the mental-state element from both crimes; then by not granting his motion for acquittal on the structuring count; and finally by not adequately responding to the government's prejudicial comments in closing argument and at sentencing. Disagreeing, we affirm.

## HOW THE CASE GOT HERE

Presented in the light most favorable to the jury's verdict, see United States v. Rodríguez-Soler, 773 F.3d 289, 290 (1st Cir. 2014), the underlying facts are easily summarized.

### Smelling Something Fishy

In May 2015, an IRS agent posing as a financial agent named "Bob" cold-called Carlos Rafael. Nicknamed "the Codfather," Rafael then owned Carlos Seafood, a commercial-fishing business located in New Bedford, Massachusetts. "Bob" told Rafael that he and a man named "Lenny" — actually an undercover agent as well — wanted to buy Carlos Seafood. His interest piqued, Rafael agreed to meet with "Bob" and "Lenny" to discuss a possible sale.

Two times the next month, in June 2015, "Bob" and "Lenny" — wearing concealed body wires — met with Rafael at Carlos Seafood. Rafael told them that he might be willing to part with the business

if they could come up with $150 million or so.  He also bragged that he had fish sales that were not being taxed properly and that he avoided paying income tax on piles of cash he was getting from sales to a New York customer.

After summering in Portugal, Rafael told the agents in a secretly-recorded meeting in October 2015 that he had a Portuguese friend named "Freitas" who worked for the "Sheriff's Department" and could sneak cash by security at Boston's Logan International Airport ("Logan").  Given the importance of what he said there, we quote from the transcript of the recorded conversation at length (fyi, Rafael is identified in the transcript by his first name, Carlos):

> **CARLOS:**  But I guess in Boston, I can get the money through.  I have one of the guys in Boston, one of those fuckin' agents who is my friend, and I give him the money before I go through security.
>
> **LENNY:**  OK, and then he . . .
>
> **CARLOS:**  Then I go to the bathroom.
>
> **LENNY:**  And he gives you the money.
>
> **CARLOS:**  He gives me the motherfucking money.
>
> **BOB:**  Nice.
>
> **CARLOS:**  Even if he is not in the airport, he lives in Rhode Island, I'll call him up.  I don't give him nothing.  He is my friend.
>
> **LENNY:**  Oh he's your friend.

- 4 -

**CARLOS:** I call him. I says, Hey, I'm flying out tonight. "You're not fucking, I'm not working tonight." No, you better get your fucking ass here because I got like 60,000 in my fucking ass. I ain't going through the fucking thing. So he goes there, I give him the envelopes, he puts them in his pockets. He doesn't go through security because he has one of those fuckin' badges. He's an agent over there.

The transcript continues:

**CARLOS:** He's been over to my house, we're buddies.

**BOB:** Heck yeah he's your buddy I'd make him my buddy too. That's a good buddy to have.

**CARLOS:** He's a Portagee.

**BOB:** Oh, he's Portuguese? Even better.

**CARLOS:** He's from St. Michael, he's from the Azores.

**BOB:** He's from there.

[crosstalk]

**LENNY:** You realize he works for the . . .

**BOB:** He works for the Sheriff's Department[.] Oh sweet.

**CARLOS:** I got him the job, I got him the raises, so he'll do what the fuck I tell him to do. He called me. He says, "what the fuck is going on, everybody got a promotion in this fuckin' place but me." So I'm like this with the sheriff. I called the Sheriff and I said ["]what the fuck are you doing to me Tom? Fuckin Freitas has been there for so many fuckin' years, you're not going to give him a fuckin' promotion and a raise?" "Jesus Carlos, we do not have enough money in the budget." I said fuck off, find a way, give the kid a raise. He got his promotion, right, so he called me and said I want to thank you very much, I finally got my fuckin' promotion and my raise. So it's nice to know people.

Rafael explained that Freitas worked on customs with the immigration unit of the Sheriff's Department. And he said that Freitas could also help them get their cash out of the country by bypassing airport security.

A few days later, still in October 2015, "Bob" asked Rafael over the phone if Rafael could help him and "Lenny" get their money around airport security so that they could take it to Portugal. All right, Rafael said. During another phone call, also in October 2015, "Bob" asked Rafael if Freitas could help get the money through the airport. Rafael said yes, but added that "Bob" could not meet Freitas in person. This is what Rafael proposed: "Bob" would give the money to Rafael. Rafael would hand the money to Freitas. Freitas would get the money through security and give the money to back to Rafael. And Rafael would deliver the money back to "Bob."

*Fishing for Freitas*

Checking some databases, agents then found an Antonio Freitas, an employee of the Bristol County Sheriff's Office assigned since 2007 as a task-force officer with U.S. Immigration and Customs Enforcement ("ICE") in Boston. Freitas, agents learned, had a security badge for Logan that let him bypass security. And Freitas's employment file showed that in September

2014, he got promoted to the position of "Sergeant ICE Investigations."

Agents also learned that around the time of his promotion, Freitas completed a multiday training program for ICE officers that covered (among other topics) financial crimes, including structuring and bulk-cash smuggling — an instructor, for example, told attendees that structuring involved "having more than $10,000 in cash and breaking it into smaller amounts to conduct financial transactions in order to avoid the reporting requirements." At the end of the training, Freitas took and passed a multiple-choice exam, getting every question right — including correctly answering that air passengers leaving the United States must report the "transportation of currency in excess of $10,000" on them "or in their luggage."

*Catching Freitas*

At some point in 2016, Rafael asked Freitas to courier $20,000 from the United States to Portugal and deposit the funds into Rafael's bank account there. Freitas felt uncomfortable taking that much cash because he knew he would have to file a disclosure form. But he took $17,500 from Rafael and divided it between himself and his girlfriend, Giovania Lima (whom the government called to testify at trial). With something like $8,500 or $9,000 in his bag and the rest in hers, Freitas and Lima passed

through Logan's security one evening in early February 2016 and jetted off to Portugal (agents surveilling the scene saw them board without incident). Once there, Freitas made the required deposit for Rafael. Bank records confirm that deposit. And phone records reveal that Freitas and Rafael exchanged multiple calls right before the Portugal getaway. Lima would later say that just before the trip, Freitas told her that he had to take a friend's money to Portugal. Freitas got her travel bags together, she said. And looking at her bags, she saw an envelope with $4,000 or $9,000 scrawled across it. She understood that she had to carry that envelope with her on the flight and that Freitas would carry a second envelope with him — which is precisely what they did. And while in Portugal, Lima added, Freitas deposited "about $17,000" into a bank account.

Coinciding with the arrest of Rafael, law-enforcement agents confronted Freitas at the end of February. Among other things, agents asked him if Rafael ever asked him to carry money out of the country or circumvent airport screening. Freitas admitted taking money to Portugal for him earlier that month, saying at one point that he took $8,500 and at other points that he took $9,000. Agents also a played piece of the recording of the October 2015 meeting involving Rafael, "Bob," and "Lenny" (we block-quoted a snippet of the recording's transcript above).

Listening to the audio, Freitas's face became flush. He then admitted that he had carried money for Rafael in the past because Rafael had helped him get a promotion and had co-signed a home-improvement loan for him.

All this, and more, led to Freitas's arrest and indictment on (as relevant here) bulk-cash-smuggling and currency-structuring charges. Agents arrested Rafael too. Waiving indictment, Rafael pled guilty to a raft of charges in a superseding information, including conspiracy, false labeling of fish, bulk-cash smuggling, tax evasion, and falsifying federal records. But Freitas rolled the dice and went to trial.

The government's witnesses testified consistent with the facts described above. Freitas's attorney called only one witness, Bristol County Sheriff Thomas Hodgson. Hodgson testified that he knew Rafael from the community, though he did not consider him a friend. Hodgson added that Freitas's becoming a "Sergeant ICE Investigations" was "not a promotion per se" but a change in status to a "designated rank" for a "specialty position." And as for how the change happened, Hodgson remembered Rafael's saying over the phone that he needed a promotion. But Rafael's call did not influence his decision, Hodgson stressed.

Freitas's counsel tried responding to the government's case through his closing argument. For example, counsel insisted

that Freitas could not be guilty of bulk-cash smuggling because the government failed to prove that he intended to evade a currency-reporting requirement. And "if there's no smuggling of money," he stressed, "then there is no structuring in this case" either. What Freitas "did was not illegal," counsel protested, because "[h]e did nothing but carry less than $10,000 himself outside the United States."

Rejecting Freitas's defense, the jury found him guilty on both counts. The district judge then sentenced him to concurrent terms of a year and a day in prison, plus three years of supervised release. And as we said, he now appeals, raising four claims of error. Taking them up in the order he presents them — and adding additional details as needed as we move along — we see no reason to reverse.[2]

## HEARSAY-STATEMENTS CLAIM

Freitas's lead argument is that the judge slipped by admitting Rafael's recorded statements under the coconspirator exception to the hearsay rule. See Fed. R. Evid. 801(d)(2)(E)

---

[2] Freitas, by the way, makes no argument that his bulk-cash-smuggling and currency-structuring convictions infracted the Double Jeopardy Clause of the Fifth Amendment. Cf. generally United States v. Del Toro-Barboza, 673 F.3d 1136, 1148-49 (9th Cir. 2012) (explaining why the Ninth Circuit believed the defendants' convictions under the bulk-cash-smuggling and currency-structuring statutes did not violate the Double Jeopardy Clause). So we say nothing on that score.

(explaining that a statement is not hearsay if it is offered against the defendant and "was made by [the defendant's] coconspirator during and in furtherance of the conspiracy").[3]  As he sees things, "[t]he broad fishing conspiracy" Rafael bragged about to the undercover agents back in October 2015 "was fundamentally different and broader in scheme" than the acts that formed the basis of his conviction.  Continuing, he says the government "failed to produce any evidence linking" his February 2016 trip "to Portugal with Rafael's broad [October] 2015 statements about his *past* practice."  And "[t]he unholy effect of blending two distinct conspiracy scenarios — Rafael's version in October 2015 vis-à-vis Freitas's actions in February 2016" — amounts to reversible error, or so he contends.

For its part, the government asserts that the judge could reasonably conclude from the evidence that a conspiracy existed in

_____

[3] Here is how this exception works.  If a defendant challenges the admissibility of a supposed coconspirator statement, the judge can conditionally admit the evidence and delay ruling until the close of all the evidence.  See, e.g., United States v. Correa-Osorio, 784 F.3d 11, 23-24 (1st Cir. 2015) (citing, among other cases, United States v. Petrozziello, 548 F.2d 20 (1st Cir. 1977)).  The government "must then prove by a preponderance of the evidence (apart from the statements themselves) the elements of admissibility under the exception — that the defendant and the speaker were coconspirators and that the speaker made the statement during the course and in furtherance of the conspiracy."  Id. at 24.  And if the government falls short, the defendant can then move "the judge to declare a mistrial or strike the statement[]."  Id.

which Freitas would help Rafael hide money from the IRS by helping him smuggle cash to Portugal. The government also believes that the judge could rationally find that Rafael made the complained-about statements in furtherance of the conspiracy because they described the conspiracy's *modus operandi* and instilled confidence in the prospective buyers that they could use Freitas's services if they bought Carlos Seafood. Also, according to the government, the fact that Freitas's conduct in February 2016 (*e.g.*, flying with his girlfriend) differed from the conduct Rafael described in October 2015 (*e.g.*, flashing a badge to get through security) did not strip the conspiracy of its essential purpose — *i.e.*, helping Rafael smuggle cash out of the United States to Portugal so that Rafael could avoid paying income taxes.

Both sides agree that because Freitas did not raise these points below, he must run the gauntlet of plain-error review — a grueling assignment, for sure, requiring him to "show (1) error, (2) plainness, (3) prejudice, and (4) an outcome that is a miscarriage of justice or akin to it." See United States v. Edelkind, 467 F.3d 791, 797 (1st Cir. 2006); see also United States v. Gordon, 875 F.3d 26, 30 (1st Cir. 2017) (stressing that "[t]he party asserting that an error was plain must carry the burden of establishing that the claimed error satisfies each element of this standard"). But this he cannot do. Here is why:

- 12 -

Agents testified that Freitas admitted that (a) Rafael gave him $17,500 to take on the Portugal flight; that (b) he split the $17,500 into increments just under $10,000; that (c) he and Lima carried those sums in their separate bags on the flight; and that (d) he deposited the $17,500 into Rafael's bank account in Portugal. On top of that, Lima testified that (e) Freitas gave her an envelope with $4,000 or $9,000 written on it to take in her bag to Portugal while he took a separate envelope with him there too; that (f) neither he nor she disclosed that they had just under $10,000 with them on the flight; and that (g) after landing in Portugal, Freitas deposited the money in a bank. Another agent testified that (h) Freitas participated in a training program that discussed financial infractions, including the elements of structuring and bulk-cash smuggling, and that (i) he correctly answered a test question that a person leaving the United States must report the "transportation of currency in excess of $10,000" on them "or in their luggage."

So even assuming (without deciding) that Freitas can satisfy plain error's error and plainness elements, he cannot satisfy the prejudice element. Cf. generally United States v. Turbides-Leonardo, 468 F.3d 34, 39 (1st Cir. 2006) (concluding there that "regardless of how we resolve the first two elements, the appellant stumbles over the third"). The prejudice analysis

- 13 -

here turns on whether it is reasonably probable that the result below would have been different without the challenged statements, see United States v. Bramley, 847 F.3d 1, 7 (1st Cir. 2017) — the statements' prejudicial effect, in other words, must have been "'substantial and injurious,'" see Turbides-Leonardo, 468 F.3d at 39 (quoting United States v. Dominguez Benitez, 542 U.S. 74, 81 (2004)); see also Rosales-Mireles v. United States, 138 S. Ct. 1897, 1904-05 (2018). Freitas's burden is far from easy. See Dominguez Benitez, 542 U.S. at 82 (declaring that the plain-error "standard should . . . encourage timely objections and reduce wasteful reversals by demanding strenuous exertion to get relief for unpreserved error"). And given the avalanche of compelling evidence mentioned in points (a) through (i) above — which showed that Freitas knew the law, that he knowingly evaded the law's requirements, and that he ended up helping Rafael sneak over $10,000 out of the country for deposit in a foreign bank — we simply cannot conclude that Freitas bore his burden of showing that it is reasonably probable that the admission of Rafael's statements affected his verdict.

Trying to persuade us otherwise, Freitas speculates "that the jury found [him] guilty by association (with Rafael) rather than guilty by his own actions." Perhaps. But his conjecture cannot help a him carry his burden on the third element

- 14 -

of the plain-error test.  <u>Bramley</u>, 847 F.3d at 8 (discussing <u>Jones</u> v. <u>United States</u>, 527 U.S. 373, 394-95 (1999)).   So Freitas's guilt-by-association surmise is not a game-changer for him.

On then to his second claim.

**INSTRUCTIONAL-ERROR CLAIM**

As noted in footnote 1, the bulk-cash smuggling statute — section 5332 — applies to "[w]hoever, with the intent to evade" certain currency-reporting requirements under section 5316,

> knowingly *conceals* more than $10,000 in currency or other monetary instruments on the person of such individual or in any conveyance, article of luggage, merchandise, or other container, and transports or transfers or attempts to transport or transfer such currency or monetary instruments from a place within the United States to a place outside of the United States . . . .

31 U.S.C. § 5332(a)(1) (emphasis added).  And subpart (a)(2) of that provision says that "concealment of currency on the person of any individual includes concealment in any article of clothing worn by the individual or in any luggage, backpack, or other container worn or carried by such individual."

At the charge conference, the judge indicated that he would instruct the jury on the elements of aiding and abetting bulk-cash smuggling.  The government saw no need for an aiding-and-abetting instruction because (according to the government) Freitas "himself" engaged in bulk-cash smuggling, with his money

- 15 -

structuring satisfying the concealment element of the crime. "All

right," said the judge, "I'll charge it that way."

And the judge did so, telling the jury that on the

concealment element, the government had to prove

> that Mr. Freitas knowingly concealed the transport of
> more than $10,000. Now that first thing is knowing
> concealment. People don't commit crimes by making
> mistakes or by just being negligent, you've got to know
> that you've got a duty to make a report, or at least
> you've got to — you're not allowed to move more than
> $10,000 cash money into or out of the country. And
> "conceal" — "conceal" is everything that the natural
> mind would think of as "concealing," it means hiding it
> and the like, but it also means structuring, the second
> crime.

The judge added:

> To "structure," a way of concealing, because of course
> its money, is if you've got more than one person
> traveling, it is to break it up, just divide it up so
> that each person is carrying less than $10,000, that
> counts as "concealing." So the first thing on the "bulk-
> cash smuggling" is knowingly to conceal a sum of money
> more than 10,000 — cash money now, more than $10,000.

Bulk-cash smuggling, continued the judge,

> can be accomplished in different ways, the structuring
> here — Congress wisely — Congress understood that when
> they were talking about money and they were putting an
> amount of $10,000 on it, that, . . . money is divisible
> into smaller amounts of money, and so they made another
> crime and that's the crime of "structuring."

And "each charge," the judge stressed,

> has to prove something that the other one doesn't, so
> for "structuring," it's not taking the money and hiding
> it somewhere, that would be to conceal it — like in the
> false bottom of a carry-on, that would be to conceal it
> knowingly, but you can "conceal" by dividing it up, if

- 16 -

> you've got more than one person traveling, so that each person has less than $10,000. But then if you do it that way, then you've also committed the crime of structuring.

Freitas's lawyer timely objected to the instruction, arguing that the judge wrongly told "the jury that 'concealment' can be 'structuring.'" But the judge overruled the objection, commenting that "the law is clear that 'structuring' can satisfy the concealment element."

Before us, Freitas attacks the instruction on two fronts. He first insists the judge incorrectly instructed the jury that the concealment element of bulk-cash smuggling includes structuring. He then insists the instruction removed the mental-state (or "*mens rea*") element from both bulk-cash smuggling and currency-structuring crimes. Neither foray succeeds, however.

As for the proper standard of review, for preserved claims of instructional error we apply *de novo* review to "questions about 'whether the instructions conveyed the essence of the applicable law'" and abuse-of-discretion review to "questions about 'whether the [judge's] choice of language was unfairly prejudicial.'" United States v. Sabean, 885 F.3d 27, 44 (1st Cir. 2018) (quoting United States v. Sasso, 695 F.3d 25, 29 (1st Cir. 2012)). Of course, we review unpreserved claims only for plain error. See, e.g., United States v. Deppe, 509 F.3d 54, 58 (1st Cir. 2007).

- 17 -

Repeating what did not work below, Freitas initially faults the judge for instructing the jury that proof of structuring can satisfy the concealment element of the bulk-cash-smuggling statute — in his telling, that instruction "had no basis in either the words of the statute, or in case law." Noting that Congress did not define "conceals" in the bulk-cash-smuggling statute, and that no opinion interprets that term, the government responds that the common meaning of "'conceals' is to hide or keep it from notice, and structuring — which," the government is quick to point out, "is defined as breaking up a single transaction above a reporting threshold into two or more separate transactions" to "evad[e] a financial reporting requirement — fits comfortably within that ordinary meaning." Because Freitas preserved this claim, and the claim involves the judge's interpretation of the concealment element, our review is *de novo*.

Freitas's lead argument — again, that the judge's instruction improperly conveyed that the government can prove the concealment element with structuring evidence — stumbles out of the gate, because he fails to develop it sufficiently here and so has waived it. Bear with us as we explain.

Freitas briefly raises this issue first by saying that the reporting-offense statute (31 U.S.C. § 5316, which is cross-referenced in the bulk-cash-smuggling act) "imposes the reporting

- 18 -

requirement" only "on a singular person who is prohibited from transporting currency to a foreign country in excess of $10,000 without filing the requisite form," and that he did not personally transport more than $10,000 to Portugal.[4]  Then he strays into a *mens-rea* discussion (more on that in a moment).  And then he gets to the crux of his argument, complaining that the instruction had no support "in either the words of the statute, or in case law."  But this appears in a single sentence, is not seriously supported (he, for example, neither cites any precedent nor explains the lack of precedent, assuming he found none), and is therefore waived.  See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) (repeating "the settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived"); see also Rodríguez v. Mun'y of San Juan, 659 F.3d 168, 175-76 (1st Cir. 2011) (same).

Having done little to elaborate on his argument in his initial brief, Freitas attempts a text-based argument in his reply brief that keys on the bulk-cash-smuggling statute (31 U.S.C.

---

[4] As mentioned in our first footnote, section 5316 basically requires that "a person or an agent or bailee of the person . . . file a report . . . when the person, agent, or bailee knowingly . . . transports, is about to transport, or has transported, monetary instruments" over "$10,000 at one time . . . from a place in the United States to or through a place outside the United States."

§ 5332(a)), rather than the reporting-offense statute (31 U.S.C. § 5316). Quoting subpart (a)(1) of section 5332, he asserts that the bulk-cash-smuggling statute speaks in terms of an "individual" carrying over $10,000 "on the person of such individual or in any conveyance, article of luggage, merchandise, or other container."[5] He then notes that neither he nor Lima carried over $10,000 — "two separate persons" carried "the sub 10K amounts." "For this reason," he writes, the judge reversibly "erred by instructing the jury that the concealment element of the bulk cash smuggling statute could be proven by structuring alone, i.e. the otherwise innocent act of dividing $17,500 into two sub $10K sums."

---

[5] For the reader's convenience, we repeat section 5332's pertinent language here, with italics added:

**(a) Criminal offense.**—

**(1) In general.**— Whoever, with the intent to evade a currency reporting requirement under section 5316, knowingly conceals more than $10,000 in currency or other monetary instruments *on the person of such individual or in any conveyance, article of luggage, merchandise, or other container*, and transports or transfers or attempts to transport or transfer such currency or monetary instruments from a place within the United States to a place outside of the United States, or from a place outside the United States to a place within the United States, shall be guilty of a currency smuggling offense . . . .

**(2) Concealment on person.**— For purposes of this section, the concealment of currency on the person of any individual includes concealment in any article of clothing worn by the individual or in any luggage, backpack, or other container worn or carried by such individual.

Conspicuously absent from Freitas's argument is any discussion of whether or how section 5332's subpart (a)(2) applies here. Curious, we raised the topic at oral argument this way. Subpart (a)(1), we noted, is structured in two pieces separated by the word "or." The first piece focuses on currency concealed "on the person of such individual" — a phrase subpart (a)(2) defines as "includ[ing] concealment in any article of clothing worn by the individual or in any luggage, backpack, or other container worn or carried by such individual." And after talking about currency concealed "on the person of such individual," subpart (a)(1)'s second piece — following the "or" — focuses on currency concealed "in any conveyance, article of luggage, merchandise, or other container," with the "or" suggesting there is a difference between what comes before it and what comes after it. Cf. generally United States v. Woods, 571 U.S. 31, 45-56 (2013) (recognizing that while the connection of terms "by the conjunction 'or' . . . can sometimes introduce an appositive — a word or phrase that is synonymous with what precedes it (Vienna or Wien, Batman or the Caped Crusader) — its ordinary use is almost always disjunctive, that is, the words it connects are to be given separate meanings" (internal quotation marks omitted)). Given how subpart (a)(1)'s "on the person" piece is specifically defined in subpart (a)(2) to include "such individual['s] "clothing . . . or . . . luggage," we

- 21 -

wondered whether subpart (a)(1)'s "in any conveyance, article of luggage," *etc.*, piece — the piece that follows the "or" — refers to *another person's* luggage, merchandise, and so on.  No, thought Freitas; yes, thought the government.

As interesting as this issue is, however, we need not decide who is right here.  You see, as a general rule, one cannot use a reply brief to develop an argument cursorily made in an opening brief.  See, e.g., Small Justice LLC v. Xcentric Ventures LLC, 873 F.3d 313, 323 n.11 (1st Cir. 2017); Pignons S.A. de Mecanique v. Polaroid Corp., 701 F.2d 1, 3 (1st Cir. 1983).  That is because an argument raised for the first time in a reply brief "come[s] too late to be preserved on appeal."  Id. (quoting parenthetically Braintree Labs., Inc. v. Citigroup Glob. Mkts. Inc., 622 F.3d 36, 44 (1st Cir. 2010)).  And Freitas offers no reason for ignoring the general rule.  So this is an issue for another day, when it is properly preserved and fully developed.

Turning then to Freitas's mental-state argument, we repeat that he believes the offending instruction erased the mens-rea element from both crimes of conviction, bulk-cash smuggling and currency structuring.  In his telling, by equating "structuring" with "concealment," the "instruction left no possibility for the jury to conclude that [he] lacked a requisite intent to evade" the reporting requirement.  Having débuted this

- 22 -

theory here (he gives us no indication at all that he preserved it below), Freitas can win only if he shows plain error. But we find no error — much less a plain error — for a simple reason: Freitas ignores that the judge gave the supposedly wrong instruction in the context of discussing whether structuring can suffice for concealment for purposes of bulk-cash smuggling. And he ignores as well that for both crimes of conviction, the judge also told the jury that it needed to find that he acted with the intent to evade the reporting requirement. Viewing the instructions as a whole — as we must, see, e.g., United States v. Candelario-Santana, 834 F.3d 8, 27 (1st Cir. 2016) — we easily conclude that Freitas's complaint that the judge scrapped the mental-state element is simply wrong.

Freitas also suggests in the instructional section of his brief that he lacked the necessary mental state for structuring because he "knew that it was unlawful for him to carry and hide or conceal on his person or luggage $10,000 or more from the United States" and so he "set out to act in accordance with the law." To the extent this argument targets the judge's instruction — as opposed to the evidence's sufficiency, which we discuss in the next part of this opinion — it goes nowhere (whether preserved or not). By his argument's own terms, Freitas knew he could not conceal more than $10,000, which left him with two options: comply

with section 5316's requirements and lawfully report it, or structure the possession of the funds so he did not have to report it. Put simply then, his own brief shows he acted with the required intent of avoiding the reporting requirements. And that is that on the instruction claim.

## INSUFFICIENT-EVIDENCE CLAIM

As we just intimated, Freitas's mental-state argument also has the flavor of a sufficiency challenge: he seems to suggest that the judge should have granted him a judgment of acquittal on the section-5324 currency-structuring charge, his theory being that the government failed to prove that he had the requisite mental state to evade a reporting requirement. To repeat, Freitas concedes that he "knew that it [was] unlawful for him to carry and hide or conceal on his person or luggage" more than $10,000 "from the United States, into a foreign country" — remember, section 5316's reporting requirements (cross-referenced in the currency-structuring statute) only apply to those carrying over $10,000. And because he did not carry over $10,000 in his luggage, he thinks that he cannot be guilty of currency structuring. He also insists — without offering any authority (or explaining the absence of authority) — that his structuring was actually an attempt to "comply" with the section 5316 limit and thus he cannot be criminally liable. The government's principal

response is that structuring to "comply" with the section 5316 limit — where "compliance" involves diluting funds to avoid the $10,000 threshold — is exactly the conduct the currency-structuring statute targets. And, the government adds, a jury could reasonably conclude from the evidence that Freitas divided the $17,500 that Rafael had given him into two sub $10,000 sums to evade the reporting requirement. For our part, we think Freitas's claim is a nonstarter.

Freitas made a general acquittal motion at the close of the government's case. But he did not renew the motion after presenting evidence in his defense or in a timely post-verdict motion. See Fed. R. Crim. P. 29(c)(1). So after viewing the evidence in the light most favorable to the prosecution, he must convince us that affirming the verdict will work a "clear and gross injustice." See, e.g., United States v. Ponzo, 853 F.3d 558, 580-81 (1st Cir. 2017); United States v. Cruzado-Laureano, 404 F.3d 470, 480 (1st Cir. 2005). That is a tall order for any defendant, since the clear-and-gross-injustice standard is "a *particularly exacting* variant of plain error review." See United States v. Foley, 783 F.3d 7, 12-13 (1st Cir. 2015) (emphasis added).

But Freitas does not attempt to bear this burden. Putting aside that he wrongly sketches the evidence in the light most favorable to him rather than to the government, Freitas fails

- 25 -

to even mention the clear-and-gross-injustice standard — much less develop any argument showing why and how it is met. And because it is not our job to make arguments that an appellant has not made for himself, we consider his sufficiency claim waived. <u>See</u> <u>Zannino</u>, 895 F.2d at 17; <u>see also</u> <u>Rodríguez</u>, 659 F.3d at 175-76.

**PREJUDICAL-COMMENTS CLAIM**

This leaves Freitas's last set of arguments, alleging that the prosecutor made prejudicial comments in his closing and at sentencing — arguments we easily turn aside.

*Closing*

During closing argument, the prosecutor highlighted for the jury Rafael's recorded statements that Freitas helped him get cash around airport security. Here is what the prosecutor said:

> Then it's Rafael's turn to ask Freitas for something, and again you can refer to the transcript . . . . This is what Carlos gets. "But I guess in Boston I can get the money through, I have one of the guys in Boston, one of those fucking agents who's my friend, I give him the money before I go through security." And he goes on to discuss in detail about how he gives the cash to Tony Freitas beforehand. Mr. Freitas, using his security badge, goes around security, circumvents security, goes to the secure areas of the airport, meets Mr. Rafael at the other side, in the men's room, gives the money back to Rafael, and Rafael gets on the plane.

Freitas's lawyer objected immediately. In overruling it, the judge told the jurors that the government could refer to evidence admitted at trial and reminded them that the conduct that

- 26 -

Rafael described in the recorded conversations was not the conduct "that was charged here."

Because Freitas's attorney timely objected to the prosecutor's comment, we ordinarily would review this claim *de novo* to see whether the contested comment was improper — and if yes, whether it was harmful, knowing that the harmfulness question turns on whether the comment "so poisoned the well that the trial's outcome was likely affected, thus warranting a new trial." United States v. Rodriguez, 675 F.3d 48, 62 (1st Cir. 2012) (internal quotation marks omitted); see also United States v. González-Pérez, 778 F.3d 3, 19 (1st Cir. 2015). But there is a serious hitch for Freitas: Under an argument heading accusing the government of injecting "unfairness and prejudice . . . into the trial and sentencing," Freitas's main brief implies that the prosecutor's closing to the jury improperly "repeated the allegation that Freitas and Rafael were co-conspirators." But as the government notes, outside of this single sentence — tacked onto the end of his brief, as a seeming afterthought — Freitas does not explain why he thinks the comment was improper. And he does not cite any authority to support his claim (nor does he explain the nonexistence of authority, assuming he unearthed none). So we hold it waived. See Zannino, 895 F.2d at 17; see also Rodríguez, 659 F.3d at 175-76.

At sentencing, the prosecutor argued (among other things) that the judge could reasonably infer that the offenses of conviction were not the only time Freitas had helped Rafael get cash out of the country. This is what the prosecutor said:

> Now we don't know if this is the only time Mr. Freitas did this. I would suggest that it's not for two reasons. In his conversations with the undercover agents, Mr. Rafael talks about having someone at the airport who helps him do this. The scenario he describes is not the scenario for which Mr. Freitas was prosecuted, the scenario Mr. Rafael describes is that he gives money to Mr. Freitas, Mr. Freitas goes through the secure areas of the airport with the money, while Rafael goes through the TSA checkpoint, and they meet in the bathroom in Terminal E, near the gate area, where Mr. Freitas gives the money back to Mr. Rafael. He describes it in detail. I can't prove that that occurred, but there is strong circumstantial evidence that this is not the only time that Mr. Freitas did this.

> Second, we know that, on at least one other instance, Mr. Freitas went to the airport to help Mr. Rafael smuggle money, that was November of 2015, he did not in fact do so on that date. But there's a lot of smoke here besides the incident for which Mr. Freitas actually stands convicted. And I would suggest that first the fact that it appears he may have done this on additional occasions and, two, the fact that he's a state and federal law enforcement officer, militates in favor of a sentence of incarceration. And in the government's view a year and a day would be a proportional sentence.

Freitas's lawyer did not object then but now contends that the prosecutor's argument improperly went beyond the evidence at trial. We review this new claim only for plain error, as Freitas admits we should. See Edelkind, 467 F.3d at 797. But as

- 28 -

the government stresses, a problem for him is that after the prosecutor made his sentencing pitch, the judge asked defense counsel to focus his sentencing recommendation on Freitas's status as a law-enforcement officer. And the judge also indicated that the "other conduct" stuff would not be the driving force behind the sentence. A further problem for him is that in explaining the thinking behind the year-and-a-day sentence, the judge emphasized Freitas's law-enforcement position but said nothing suggesting that he gave weight to the "other conduct" stuff. So even assuming (purely for argument's sake, mind you) an error that was plain, Freitas cannot show prejudice — which means he cannot surmount a prominent hurdle to plain-error relief. See id.

## WRAP UP

Our work over, we **affirm** the judgment that entered below.