# United States Court of Appeals
## For the First Circuit

No. 21-1650

DENISE DUVAL, Administrator of the Estate of Wilfred Duval,

Plaintiff, Appellant,

v.

UNITED STATES DEPARTMENT OF VETERANS AFFAIRS,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Leo T. Sorokin, U.S. District Judge]

Before

Kayatta, Howard, and Thompson,
Circuit Judges.

Traver Clinton Smith, Jr., with whom Law Offices of Traver Clinton Smith, Jr., was on brief, for appellant.
Michael L. Fitzgerald, Assistant United States Attorney, with whom Rachael S. Rollins, United States Attorney, and Eve A. Piemonte, Assistant United States Attorney, were on brief, for appellee.

June 1, 2023

**HOWARD**, **Circuit Judge**. Denise Duval, as the administrator of her father's estate, urges us to conclude that the district court abused its discretion by declining to strike expert witness testimony at a bench trial, testimony that she contends fell outside the scope of an expert's pretrial disclosures. She consequently asks that we vacate the judgment of the district court in favor of the government and remand for a new trial. Finding that any ostensible error committed by the district court was harmless, we affirm the judgment.

## I.

In this case, our review follows a bench trial, and so "[o]ur recitation of the facts is drawn from the [d]istrict [c]ourt's findings of fact and conclusions of law." Emhart Indus., Inc. v. U.S. Dep't of the Air Force, 988 F.3d 511, 515 n.1 (1st Cir. 2021); see Duval v. United States, No. 18-10405, 2021 WL 5701770 (D. Mass. July 20, 2021) (district court opinion). Our focus is trained principally on the portions of the record most relevant to Duval's argument on appeal that the government violated expert discovery rules by introducing an allegedly previously undisclosed theory on the fifth day of trial -- namely, that a suture used by medical providers on her father migrated from its intended location.

**A.**

This appeal arises from a medical malpractice action that Duval brought against the U.S. Department of Veterans Affairs under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671-2680. Duval alleged that providers at the West Roxbury Veterans Affairs Medical Center ("VA") negligently performed a percutaneous coronary intervention ("PCI") on her father, Wilfred Duval, in March 2015. Wilfred Duval died just under a year after the operation; his daughter brought this action as the administrator of his estate.

Wilfred Duval, then an 84-year-old resident of Claremont, New Hampshire, was hospitalized in February 2015 after suffering a heart attack. He was diagnosed with "severe . . . coronary artery disease" after a cardiac catheterization procedure and was then transferred to the VA for further evaluations. Because of his age and multiple comorbidities, medical providers at the VA recommended -- and Wilfred Duval agreed to -- the following two-step process to treat his coronary artery disease: first, a "minimally invasive direct coronary artery bypass" procedure ("MIDCAB"), and then a PCI. The MIDCAB procedure was completed without complications and is not at issue in this appeal.

Dr. Ioannis Chatzizisis and Dr. Sammy Elmariah performed the PCI approximately a week after the MIDCAB. As the district

court explained, "[a] PCI is a procedure used to reestablish normal blood flow to the heart. The procedure involved inserting a catheter into Mr. Duval's right femoral artery[,] . . . guiding the catheter towards the heart, and deploying a stent in Mr. Duval's left main coronary artery." Both parties agree that the providers successfully deployed the stent. Instead, the crux of Duval's medical malpractice claim stems from the providers' use of a Perclose Proglide device to suture the hole through which they inserted the catheter for the procedure. The district court credited Dr. Elmariah's testimony that he and Dr. Chatzizisis followed "the proper steps for deployment of the device." Indeed, the district court noted that the providers found no external bleeding around the site of the insertion point -- the presence of which could have indicated improper deployment of the suture -- and Wilfred Duval more generally "appeared stable at the end of the procedure."

However, Wilfred Duval's blood pressure subsequently dropped to "concerning[,] if not dangerous[,]" levels in the hours following the completion of the PCI, and a computerized tomography ("CT") scan later indicated retroperitoneal bleeding -- namely, "internal bleeding from the site at which the doctors had entered Mr. Duval's artery with [a] needle." Dr. Naren Gupta then performed emergency surgery on Wilfred Duval -- having received his daughter's consent for the operation -- and located the

- 4 -

Perclose suture not at the hole through which the catheter was originally inserted, but rather in Wilfred Duval's external oblique muscle.[1]  The surgery successfully stopped the bleeding and "saved Mr. Duval's life."

Wilfred Duval remained at the VA for nearly three months after the surgery to receive continual care and was discharged to Whittier Rehabilitation Hospital in late May 2015.  Duval and the government dispute whether her father's condition improved over the course of the following months; nevertheless, his lower extremity vascular disease -- a condition from which he suffered even prior to the heart attack -- had worsened by October and led to another hospitalization at the VA.  Duval testified that her father's condition steadily worsened thereafter, and he passed away in February 2016 "from septic shock due to pneumonia and chronic respiratory failure."  Duval claimed that the "improper deployment of the Perclose device constitute[d] malpractice because [the] incorrect placement of the Perclose suture led to

---

[1]  There is some confusion as to whether Dr. Gupta found the device in Wilfred Duval's oblique or rectus muscle.  Dr. Gupta's discharge notes stated that he "saw the Perclose device in the rectus muscle," but he later clarified during his trial testimony that this was an error and he had actually found the device in the external oblique muscle.  The relevant portion of Dr. Weinstein's (the government's expert) report accorded with the discharge notes' recitation of the facts, as did the district court's opinion, and we accordingly opt not to alter references to the rectus or abdominal muscle, since this point is far from dispositive in this appeal.

Mr. Duval's retroperitoneal bleed as well as other complications that ultimately caused his death."

**B.**

Duval filed this FTCA action in March 2018, seeking $6,000,000 in damages. The parties submitted dueling expert witness reports that in part addressed the question of whether the doctors deviated from the applicable standard of care in deploying the Perclose device. Most relevantly to this appeal, Dr. Joseph Weinstein -- the government's expert -- opined that "the failure of the [Perclose] device to deploy was not a deviation in the standard of care for the average qualified cardiologist in 2015. The fact that the device was found in the rectus [muscle] by Dr. Gupta does NOT denote that there was a deviation from the standard of care." Dr. Weinstein's report also noted that Perclose devices have a "failure rate of 7%[,]" which more or less accorded with trial testimony both from Dr. Elmariah and from Duval's expert, Dr. Tobia Mercuro. Indeed, Dr. Elmariah testified that the "failure rate is higher . . . for arteries such as [Wilfred Duval's], where there's a lot of calcium." Neither party deposed the other's expert witness before trial, despite being entitled to do so by Rule 26. See Fed. R. Civ. P. 26(b)(4)(A).

As noted, the district court held a six-day bench trial, during which the district judge heard testimony from ten witnesses and admitted over two dozen exhibits. The question of whether the

suture could migrate from its original location surfaced several times during the proceedings. First, the government indicated to the district court during its opening statement that the court would "hear that . . . the fact that the suture was found in the abdominal muscle does not mean that it was initially deployed there." Later that day, government counsel asked Duval's expert, Dr. Mercuro, on cross-examination whether he knew where Drs. Elmariah and Chatzizisis had deployed the suture, to which Dr. Mercuro responded that "if it[] [was] found sutured in the rectus muscle, that's where it had to be initially deployed." Government counsel then asked Dr. Mercuro if his opinion was "that it cannot be the case [that] a suture is deployed in one area, and then subsequently dislodged," to which Dr. Mercuro responded that "the suture will not migrate." Most significantly, the government's expert, Dr. Weinstein, and government counsel had the following colloquy on the fifth day of trial concerning Dr. Gupta's having found the suture away from the femoral artery:

> Q. How, if at all, does [Dr. Gupta's finding] indicate how the Perclose was deployed?
>
> A. So it doesn't indicate how the Perclose was deployed. All it indicates is that the device, at some point, migrated from the femoral artery to the place where it was found at the time of surgery, which was, again, approximately six hours later.
>
> Q. And how can a Perclose device migrate?

- 7 -

A. A Perclose device can migrate for several reasons. One, it could have been deployed appropriately, and then migrated as a result of the fact that the vessels that it was deployed in were severely dozed [sic]. It could have been deployed [sic] due to patient movement or being not secured appropriately. It could have been deployed and then moved because of the fact that the patient subsequently did have another angiogram, and a balloon was placed into the femoral artery to stop bleeding.

Duval urged the district court to strike this testimony on three occasions. She first asked the district court to do so shortly after the colloquy above "on the premise that [Dr. Weinstein was testifying to] possibilities, but he's not testifying to facts," but the district court denied this motion. She again moved to strike this portion of Dr. Weinstein's testimony later that day, arguing both that "it was pure speculation," and -- most importantly for the purposes of this appeal -- that she "had no warning" and "never knew [Dr. Weinstein] was going to testify [to] that . . . [because] [i]t wasn't disclosed." The district court denied this motion without prejudice. Finally, in her proposed findings of fact and conclusions of law, Duval included a passage striking the relevant testimony.

## C.

The district court ultimately found in the government's favor on Duval's claims because it concluded "that there was no malpractice." Applying Massachusetts medical malpractice law --

as is mandated by the FTCA, see 28 U.S.C. § 1346(b)(1) -- the court concluded that Dr. Elmariah "was skilled, experienced, and meticulous[,] and that he appropriately supervised Dr. Chatzizisis during the PCI and in the deployment of the Perclose device."[2] See Parr v. Rosenthal, 475 Mass. 368, 376 (2016) ("To state a claim for medical malpractice, a plaintiff must demonstrate [in part] that . . . the defendant physician was negligent, which in medical malpractice cases means that the physician committed a breach of the 'standard of care and skill of the average member of the profession' practicing in his or her specialty." (quoting Bradford v. Baystate Med. Ctr., 415 Mass. 202, 206 (1993))). While "[t]here is no doubt that the suture did not successfully and permanently seal the hole in Mr. Duval's artery," the district court noted that -- as discussed in Dr. Weinstein's expert disclosures -- "the Perclose device has a known failure rate . . . [and] Dr. Elmariah testified that the failure rate is higher for arteries with substantial calcium deposits, such as Mr. Duval's artery." Ultimately, the court concluded that Duval did not prove malpractice with regard to the deployment of the Perclose device by a preponderance of the evidence because "the evidence demonstrates that the technique employed (selection of the

---

[2] The district court also rejected Duval's argument that delays in diagnosing the retroperitoneal bleed in the aftermath of the PCI deviated from the standard of care, but this aspect of the court's opinion is not at issue on appeal.

Perclose device) met the standard of care and that the physicians complied with the standard of care in their implementation of the technique (the deployment of the Perclose device)." As further discussed below, the court also addressed the suture-migration issue in a footnote to its opinion but did not purport to resolve the dispute over the legitimacy of the theory.[3]

Having found that Duval failed to prove a breach of the standard of care, the district court entered judgment in favor of the government. This appeal followed.

**II.**

As noted, the sole challenge Duval advances on appeal concerns the admission of Dr. Weinstein's challenged testimony in the context of the government's expert witness disclosure obligations. We review the admission of expert testimony for abuse of discretion. Gay v. Stonebridge Life Ins. Co., 660 F.3d 58, 61 (1st Cir. 2011). "Pursuant to that standard, 'embedded findings of fact are reviewed for clear error, questions of law are reviewed de novo, and judgment calls are subjected to classic abuse-of-discretion review.'" Martínez v. United States, 33 F.4th 20, 27

---

[3] The court also stated in its opinion that "[n]either party objected to expert testimony on this matter as beyond the scope of the expert reports." This observation appears to be inconsistent with Duval's second motion to strike and her proposed findings. But Duval does not advance any argument in her briefs on appeal that the district court erred in making the statement, and has therefore waived any argument to that effect.

(1st Cir. 2022) (quoting Lawes v. CSA Architects & Eng'rs LLP, 963 F.3d 72, 90 (1st Cir. 2020)).

But our inquiry does not end there. Even "[i]f we determine that the testimony was erroneously admitted, we [still] then review that admission for harmless error." Gay, 660 F.3d at 62. "Our harmlessness inquiry is whether . . . [the] admission of the evidence affected plaintiff's substantial rights. The central question is whether this court can say with fair assurance that the judgment was not substantially swayed by the error." Dusel v. Factory Mut. Ins. Co., 52 F.4th 495, 512 (1st Cir. 2022) (ellipsis in original) (quoting Gay, 660 F.3d at 62); see also Fed. R. Civ. P. 61 ("Unless justice requires otherwise, no error in admitting or excluding evidence -- or any other error by the court or a party -- is ground for granting a new trial . . . . At every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights.").[4]

---

[4] Duval at least partly predicates her arguments against harmlessness on Rule 37(c)(1)'s instruction to district courts that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." The government contends that Rule 37(c)(1) is "inapposite" because "the district court found no violation of Rule 26(a), and therefore had no occasion to consider sanctions under Rule 37."

The government has the better of the argument. Our cases suggest that the standard prescribed in Gay controls in appeals like Duval's of alleged abuses of discretion in admitting expert testimony. This standard originates from Kotteakos v. United

- 11 -

**III.**

**A.**

"Recognizing the importance of expert testimony in modern trial practice, [Rule 26] provide[s] for extensive pretrial disclosure of expert testimony." Lawes, 963 F.3d at 90 (alterations in original) (quoting Thibeault v. Square D Co., 960 F.2d 239, 244 (1st Cir. 1992)). "Plaintiffs and defendants alike must identify their expert witnesses and produce their experts'

States, 328 U.S. 750, 765 (1946) ("But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected." (emphasis added)), and is rooted in the Federal Rules of Civil and Criminal Procedures' harmless-error provisions, id. at 757 n.9. By contrast, the factors we incorporate into our review of a district court's decision to order preclusion under Rules 26 and 37 differ from the standard prescribed in Gay. See, e.g., Martínez, 33 F.4th at 34 (noting that factors we assess in reviewing a district court's decision to order total preclusion of an expert's testimony based on failure to comply with discovery obligations include "(1) the history of the litigation; (2) the sanctioned party's need for the precluded evidence; (3) the sanctioned party's justification (or lack of one) for its late disclosure; (4) the opponent-party's ability to overcome the late disclosure's adverse effects[;] . . . and (5) the late disclosure's impact on the district court's docket" (quoting Esposito v. Home Depot U.S.A., Inc., 590 F.3d 72, 78 (1st Cir. 2009))); Lawes, 963 F.3d at 92 ("As to [appellant's] quarrel with the district court's sanction [of preclusion], the question 'is not whether we would have imposed the same sanction. Rather, the question is whether the district court's action was so wide of the mark as to constitute an abuse of discretion.'" (quoting Macaulay v. Anas, 321 F.3d 45, 51 (1st Cir. 2003))). We nevertheless note that at least the D.C. Circuit has incorporated harmlessness under both Rule 37 and Rule 61 into its analysis in a similar scenario. See, e.g., Muldrow ex rel. Estate of Muldrow v. Re-Direct, Inc., 493 F.3d 160, 167-68 (D.C. Cir. 2007).

reports by court-approved deadlines." Id. (citing Fed. R. Civ. P. 26(a)(2)(A)-(B)).    Most relevant to this appeal is Rule 26(a)(2)(B)(i), which requires expert witness reports to include "a complete statement of all opinions the witness will express and the basis and reasons for them."

As noted above, Duval contends that Dr. Weinstein's report ran afoul of the "complete statement" requirement by omitting the migration theory that surfaced at trial.  She points us to the district court's statement in its opinion that "[n]either expert report discussed whether a Perclose suture can migrate post-deployment" as evidence for this proposition.  More specifically, she argues that Dr. Weinstein's statement in his report that "the failure of the device to deploy was not a deviation in the standard of care for the average qualified cardiologist in 2015" could not have alerted her to the theory that the suture had migrated post-deployment, as subsequently discussed at trial.  For its part, the government counters with the subsequent sentence in Dr. Weinstein's opinion, which read, "[t]he fact that the device was found in the rectus sheath by Dr. Gupta does NOT imply that there was a deviation from the standard of care."  Citing to our decision in Gay for the proposition that experts are entitled to "reasonabl[y] elaborat[e]" on previously disclosed opinions at trial, 660 F.3d at 64, the government argues that Dr. Weinstein's migration-focused testimony merely constituted "a reasonable

explanation of his opinion that the location of the suture did not imply negligence in its deployment."

### B.

Despite the parties' ample briefing on the subject, this dispute need not detain us. We ultimately conclude that, even assuming that Duval is correct in her contention that the district court erred in admitting Dr. Weinstein's migration-focused testimony, any error was harmless. As noted above, the focus of our harmlessness inquiry at this juncture is to ensure ourselves that "the judgment was not substantially swayed by the error." Gay, 660 F.3d at 62 (quoting Rubert-Torres v. Hosp. San Pablo, Inc., 205 F.3d 472, 480 (1st Cir. 2000)). This review is meant to provide "a check upon arbitrary action and essential unfairness in trials," and not a "multiplicity of loopholes which any highly rigid and minutely detailed scheme of errors . . . will engender and reflect in a printed record." Kotteakos, 328 U.S. at 760; see also Shinseki v. Sanders, 556 U.S. 396, 407 (2009) ("We have previously warned against courts' determining whether an error is harmless through the use of mandatory presumptions and rigid rules rather than case-specific application of judgment, based upon examination of the record.").

Here, we are unconvinced that any ostensible error in admitting Dr. Weinstein's testimony "substantially swayed" the judgment below. Duval contends that "[t]he Government offered no

other expert testimony on negligence than the 'migration' theory, and therefore offered no negligence defense other than [that] theory." But, as noted above, our harmlessness inquiry focuses on the district court's reasoning, and we do not have any indication that the court relied on Dr. Weinstein's challenged testimony in a way that would fundamentally call its bottom-line conclusion (i.e., that Drs. Elmariah and Chatzizisis did not breach the standard of care) into question. Cf. Dusel, 52 F.4th at 512 ("In this case, we can say with such assurance that neither the district court's judgment nor our de novo review was affected by any alleged error as neither court relied on the evidence that [appellant] disputes.").

To be sure, Duval's case is distinguishable from Dusel, a case in which the challenged evidence was duplicative of other materials in the record, and in any case "neither the district court's holding nor our . . . review relie[d] on" it. Id. Here, by contrast, the district court stated that it "considered" Dr. Weinstein's testimony "that sutures can migrate in certain conditions . . . in determining Dr. Elmariah's credibility, as well as in determining whether proper procedure was followed by Dr. Elmariah and Dr. Chatzizisis in deploying the Perclose device." But the district court similarly stated that it considered the testimony of Duval's expert that a suture will not migrate once deployed as well. And, as the government stresses, the district

court apparently found no need to resolve that disagreement. Rather, it focused on the device's failure rate even when properly used -- noting testimony that "the failure rate is higher for arteries with substantial calcium deposits, such as Mr. Duval's artery" -- and highlighted evidence that the device was properly used in this case, such as the facts that "Mr. Duval did not display external bleeding after the doctors used the Perclose device and the doctors did not observe any puffiness or swelling around his groin area, both of which would have been indicators that the Perclose device did not correctly deploy." On this record, we cannot conclude that any error in admitting Dr. Weinstein's testimony "substantially swayed" the district court's judgment. Cf. Gay, 660 F.3d at 64 (reasoning that admitting testimony that allegedly was beyond the scope of an expert report was harmless when that "testimony [could not] reasonably be understood as the pivotal evidence that tipped the verdict in favor of [appellee]").

Duval responds that the district court could not have concluded that the doctors complied with the standard of care without also concluding that the suture migrated, given that the suture was found in the rectus muscle. Duval thus infers that the district court did in fact conclude that the suture migrated, even though the court did not explicitly resolve that matter.

But this inferential reading of the court's opinion could apply just as well to the expert disclosure made by the government. In acknowledging where the device was found while expressly rejecting any claim that that fact meant that the attempted deployment was negligent, the expert disclosure itself -- if read in the same way Duval reads the court's opinion -- implied that migration must be possible. All that is to say that if we read the district court as implicitly accepting that migration was possible, then we should similarly read the government's expert disclosure. So Duval's only developed rejoinder to the government's harmlessness argument would undermine her argument that she was unfairly surprised by the migration theory at trial.[5] This -- paired with the fact that plaintiff's counsel expressed no surprise when government counsel mentioned migration in opening, or even when the migration testimony was first offered -- further supports our above

---

[5] To be clear, to the extent that Duval meant to use the relevant portion of her brief as an argument that the court erred under Massachusetts law in concluding that the doctors' deployment of the Perclose device did not deviate from the standard of care, we deem any such argument waived for lack of development. Cf. United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."). Duval did not cite to a single case in support of this proposition in the relevant section of her brief. See United States v. Freitas, 904 F.3d 11, 21 (1st Cir. 2018) (applying Zannino waiver to an argument for which appellant "neither cite[d] any precedent nor explain[ed] the lack of precedent").

conclusion that any error by the district court in allowing the testimony did not "substantially sway" the trial's outcome.

**IV.**

Duval raises the concern that a ruling adverse to her might encourage misbehavior by litigants in the future. On the contrary, our decision in this case in no way should be read to condone Rule 26 violations; the rule's requirements are "an integral part of the machinery devised to facilitate the management of pretrial discovery." Lawes, 963 F.3d at 90 (quoting Downey v. Bob's Disc. Furniture Holdings, Inc., 633 F.3d 1, 5 (1st Cir. 2011)). But, given our harmlessness analysis, we nevertheless cannot say on the record before us that the alleged error in admitting Dr. Weinstein's testimony warrants upsetting the district court's considered judgment. The judgment of the district court is thus **affirmed**.