# United States Court of Appeals
## For the First Circuit

No. 22-1507

LIDIA LECH,

Plaintiff, Appellant,

v.

DOROTHEA VON GOELER; BAYSTATE MEDICAL PRACTICES, INC.; HAMPDEN
COUNTY SHERIFF'S DEPARTMENT; MARIA DIAZ; NICOLE SKORUPSKI;
ELIZABETH MEAUX; SHANTELLE ROSADO; JULIE BELLE-ISLE; LYNN CHASE;
MICHAEL J. ASHE, JR.; PATRICIA MURPHY; NICHOLAS COCCHI; NATALIE
CRUZ; and MICHAEL VANCINI,

Defendants, Appellees,

JOHN DOE 1 and JOHN DOE 2,

Defendants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Katherine A. Robertson, U.S. Magistrate Judge]

Before

Rikelman, Selya, and Howard,
Circuit Judges.

Daniel Volchok, with whom Allison M. Schultz, Joseph M. Meyer,
Michael Moorin, Wilmer Cutler Pickering Hale and Dorr LLP, and
John R. Godleski were on brief, for appellant.

Thomas E. Day, with whom Lauren F. Olanoff and Egan, Flanagan
and Cohen, P.C. were on brief, for appellees Hampden County
Sheriff's Department, Maria Diaz, Nicole Skorupski, Elizabeth

Meaux, Shantelle Rosado, Julie Belle-Isle, Lynn Chase, Michael J. Ashe, Jr., Patricia Murphy, Nicholas Cocchi, Natalie Cruz, and Michael Vancini.

Michael B. Doherty, with whom Kevin C. Giordano and Keyes and Donnellan, P.C. were on brief, for appellees Dorothea von Goeler and Baystate Medical Practices, Inc.

---

February 2, 2024

---

**RIKELMAN**, <u>**Circuit Judge**</u>.  When she was thirty-four weeks pregnant and during a three-month period of incarceration at a correctional facility in Western Massachusetts, Lidia Lech experienced a stillbirth.  She sued healthcare providers and other staff affiliated with the facility, alleging that they disregarded her concerns about the serious medical symptoms she was experiencing and denied her repeated requests to go to a hospital, resulting in her baby's death.  The district court granted summary judgment to one of the defendants but permitted most of Lech's other claims to proceed to trial, after which a jury returned a defense verdict.

Lech now challenges the grant of summary judgment and two of the district court's evidentiary rulings at trial. According to Lech, the erroneous evidentiary rulings reinforced each other and precluded her from responding fully to the defense's central theory of the case: that the jury should believe the medical staff and not Lech.

After careful review and on the undisputed facts here, we conclude that the district court did not err in granting summary judgment to a correctional officer on Lech's claims of deliberate indifference and intentional infliction of emotional distress.  We determine, however, that the district court did abuse its discretion in the two evidentiary rulings challenged on appeal. Together, the rulings permitted the defense to use extrinsic

evidence to impugn Lech's character for truthfulness while simultaneously precluding Lech from introducing testimony corroborating her version of events. Because we conclude that at least one of these evidentiary rulings was not harmless, we vacate the jury verdict and remand for a new trial against most of the defendants.

## I. BACKGROUND

### A. Relevant Facts

We present the facts relevant to the challenged evidentiary rulings in a "balanced" manner, "objectively view[ing] the evidence of record." United States v. Velazquez-Fontanez, 6 F.4th 205, 212 (1st Cir. 2021) (citation omitted).[1]

On October 4, 2013, when she was approximately twenty-two weeks pregnant, Lech was incarcerated at the Western Massachusetts Regional Women's Correctional Center (WCC) for a probation violation. Lech's 2013 pregnancy was high-risk because she had experienced a uterine rupture during a previous pregnancy and then miscarried. During her intake with medical staff at WCC on October 4, Lech reported that she had a high-risk pregnancy. Shortly thereafter, WCC received, and medical staff members

---

[1] When we review the district court's grant of summary judgment infra, we recite the facts relevant to that issue in the light most favorable to Lech "consistent with record support." Lahens v. AT&T Mobility P.R., Inc., 28 F.4th 325, 328 (1st Cir. 2022).

reviewed, Lech's medical records documenting her prior uterine rupture and miscarriage. Lech's medical records at WCC likewise noted that her "principal diagnosis" was high-risk pregnancy. A few weeks later, in November, Lech was referred to a maternal-fetal medicine physician, a specialist who receives additional training within the field of obstetrics and gynecology focusing on high-risk pregnancy. The specialist recommended that she deliver via cesarean section (C-section) because labor would increase the risk of another uterine rupture, which would be life-threatening to Lech and her baby. Lech's C-section was scheduled for mid-January.

Lech's claims in this case focus on the period of December 22, 2013, to January 1, 2014, when Lech was about two to three weeks away from her scheduled C-section. Lech testified at trial that, during this time period, she sought near-daily medical attention for her pregnancy and became extremely concerned that something was wrong. She stated that she reported to WCC medical staff increasing signs of serious problems with her pregnancy, including decreased fetal movement, vaginal discharge, cramping, a "dropping feeling" in her abdomen, a "bulging sensation" on her right side, and, later, vaginal bleeding. Lech also stated that, because of these symptoms, she repeatedly requested to go to the hospital. And yet, she maintained, WCC medical staff either belittled or ignored her symptoms. WCC medical staff, by contrast,

denied that Lech reported any pregnancy-related symptoms other than those contained in the medical notes for each of Lech's visits -- which report either no pregnancy-related symptoms at all or only a small subset of them.[2] The staff further denied that Lech ever asked them to send her to the hospital.

Eventually, on January 1, 2014, Lech was transported to the hospital. That night, she had told Natalie Cruz, a correctional officer at WCC, and a nurse on staff that she was experiencing vaginal bleeding; Lech testified that she had also told them she believed she was going into labor. The nurse contacted the on-call certified nurse midwife, who directed that Lech should be sent to the hospital.

Lech arrived at the hospital on the morning of January 2, 2014. There, she was told that her baby had passed away. Physicians diagnosed her with a suspected placental abruption, a condition in which the placenta separates from the uterus, depriving the fetus of oxygen. Lech had a C-section later that day.

---

[2] Specifically, defendants agree that Lech reported decreased fetal movement once, on December 23, 2013, vaginal discharge once, on December 30, 2013, and some vaginal bleeding and cramping on January 1, 2014, as the providers' medical records document, but they deny that Lech reported any other pregnancy-related symptoms.

## B. Legal Proceedings

Lech filed this action in 2017, naming as defendants several healthcare providers and correctional personnel at WCC with whom she interacted in the days before she learned of her stillbirth, as well as their employers. The defendants included six nurses, two correctional officers, and the assistant superintendent at WCC; the Hampden County Sheriff's Department, which employs those staff; and the Hampden County Sheriff (collectively, "the Hampden County defendants"). They also included Dr. Dorothea von Goeler, an internal medicine physician who provides medical care at WCC as an independent contractor, and her employer, Baystate Medical Practices, Inc. (collectively, "von Goeler"). In her complaint, Lech alleged that defendants disregarded her concerns about her pregnancy and denied her repeated requests to go to the hospital, which resulted in her baby's death. She brought Eighth Amendment claims based on defendants' deliberate indifference to her serious medical needs and Massachusetts state-law claims of deliberate indifference, negligence, medical malpractice, and intentional infliction of emotional distress (IIED). The parties agreed to have a magistrate judge conduct all proceedings.[3]

---

[3] We refer to the magistrate judge as the district court throughout this opinion.

The district court resolved some of Lech's claims at the summary-judgment stage. As relevant here, it found that Natalie Cruz, whom Lech told that she needed medical care on January 1, 2014, was entitled to summary judgment on Lech's deliberate indifference and IIED claims against her.

Most of Lech's other claims proceeded to a jury trial, which was held over 17 days. The fact witnesses included Lech, members of the medical and correctional staff at WCC, Lech's mother, and Lech's close friend, Alfred Zygmont, who had visited her at the facility twice during the critical time period. Both parties also offered expert testimony, which primarily focused on the timing and cause of Lech's stillbirth and whether the medical staff's treatment as documented in their medical notes complied with the standard of care.

Throughout trial, the defendants all agreed on one central theory of the case: that Lech never told the facility's medical staff about most of the pregnancy-related concerns she claimed to have reported and that the medical providers' version of events, not Lech's, was credible.[4] Defendants focused on this theory in their opening statement, asserting that the jury would "hear two stories," the first of which was alleged in Lech's

---

[4] In addition, von Goeler offered a causation theory, claiming that Lech's stillbirth occurred before she saw von Goeler on December 30, 2013, and was caused in part by Lech's underlying risk factors.

-8-

complaint and in her testimony, and the second of which was told by medical providers, their medical records, and "Lech's own recorded phone calls." As the defense framed the case, the true story of what transpired "is told not by what [Lech] says but what she doesn't say."

Recorded phone calls that Lech made to her family and then-boyfriend while at WCC took center stage in the defense.[5] Defendants used the contents of the calls in two key ways. First, they argued that Lech's calls undercut her own testimony because "what [the jury] w[ould not] hear" in those calls was Lech stating that she "th[ought] she need[ed] to go to the hospital" or "that [she] ha[d] asked the medical providers to send her to the hospital and they ha[d] refused." Thus, defendants maintained, Lech's failure to mention her symptoms or appointments with WCC medical staff during the calls "contradict[ed] the story . . . Lech [was] trying to tell [the jury] through this lawsuit." Second, defendants used other portions of Lech's calls to demonstrate specific occasions on which she allegedly lied about topics unrelated to her health or medical care, contending that those lies showed her general character for untruthfulness.

At trial, the district court made two evidentiary rulings that Lech challenges on appeal, both of which implicate

---

[5] It appears that WCC records all phone calls made by individuals incarcerated there.

defendants' attacks on her credibility. During Lech's cross-examination, the district court allowed defendants to play recordings of Lech's phone calls to prove her purportedly untruthful character. It then excluded testimony from Zygmont about statements Lech made to him when he visited her at WCC on December 26 and 28, 2013. Based on Lech's proffer at trial, Zygmont would have corroborated her version of events by testifying that, during those visits, Lech told him that she was concerned about her pregnancy, that she thought she needed to go to the hospital, and that WCC staff were not paying attention to her.

The jury ultimately found in favor of defendants on all claims. This timely appeal followed.

## II. STANDARD OF REVIEW

We review preserved objections to the district court's evidentiary rulings for abuse of discretion. United States v. Kilmartin, 944 F.3d 315, 335 (1st Cir. 2019). An abuse of discretion occurs "when a material factor deserving significant weight is ignored, when an improper factor is relied upon, or when all proper and no improper factors are assessed, but the court makes a serious mistake in weighing them." Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co., 161 F.3d 77, 83 (1st Cir. 1998) (quoting Foster v. Mydas Assocs., Inc., 943 F.2d 139, 143 (1st Cir. 1991)). An error of law qualifies as an abuse of discretion. Torres-Rivera v. O'Neill-Cancel, 524 F.3d 331, 336 (1st Cir. 2008).

If we determine that the district court erroneously admitted or excluded evidence, we then review that ruling for harmless error. Duval v. Dep't of Veterans Affs., 69 F.4th 37, 42 (1st Cir. 2023) (quoting Gay v. Stonebridge Life Ins. Co., 660 F.3d 58, 62 (1st Cir. 2011)). An error is harmless if it is "highly probable that [it] did not affect the outcome of the case." McDonough v. City of Quincy, 452 F.3d 8, 19-20 (1st Cir. 2006); see also Nieves-Villanueva v. Soto-Rivera, 133 F.3d 92, 102 (1st Cir. 1997) (explaining that in a civil case, the party claiming error has the burden of demonstrating that the error was not harmless). To determine the probable impact of improperly admitted or excluded evidence on the jury verdict, we consider factors such as "[t]he centrality of the evidence, its prejudicial effect, whether it is cumulative, the use of the evidence by counsel, and the closeness of the case." Kowalski v. Gagne, 914 F.2d 299, 308 (1st Cir. 1990) (quoting Lataille v. Ponte, 754 F.2d 33, 37 (1st Cir. 1985)); accord Nieves-Villanueva, 133 F.3d at 102. We weigh these factors "in the context of the case," as drawn "from the record as a whole." Nieves-Villanueva, 133 F.3d at 102 (citation omitted).

A different standard applies to the district court's grant of summary judgment to Cruz. We review that ruling de novo, drawing all reasonable inferences in favor of Lech, the nonmoving party. Fincher v. Town of Brookline, 26 F.4th 479, 485 (1st Cir.

2022).  "Summary judgment is proper if the movant," here Cruz, "shows that there is no genuine dispute as to any material fact and [she] is entitled to judgment as a matter of law."  Id. (quoting Fed. R. Civ. P. 56(a)).

### III. DISCUSSION

We begin by discussing Lech's challenge to the district court's evidentiary rulings.  We ultimately determine that the district court abused its discretion both by permitting defendants to use Lech's recorded phone calls to attack her character for truthfulness and by excluding Zygmont's proffered testimony.  At least one of these errors was not harmless as to the Hampden County defendants, whose defense hinged on the jury finding that Lech's version of events was not believable, and thus requires a new trial as to those defendants.  We cannot say that the evidentiary rulings affected the outcome of the trial as to von Goeler, however, because she offered a causation defense that did not implicate Lech's credibility and instead relied on a concession by Lech's own expert: that it was possible Lech's stillbirth occurred before her appointment with von Goeler.  After addressing the evidentiary rulings, we turn to the grant of summary judgment to Cruz on the deliberate indifference and IIED claims, which we affirm.

## A. Evidentiary Rulings

### 1. Use of Lech's Recorded Phone Calls

In her first challenge to the district court's evidentiary rulings, Lech argues that the district court erred when it allowed defendants to play portions of recorded calls she made at WCC to prove her purportedly untruthful character. She asserts that this use of the recordings violated Federal Rule of Evidence 608(b).

We address the standard of review before turning to the substance of Lech's argument. The Hampden County defendants contend that we must review Lech's claim for plain error because she did not object to the admission of the phone calls, which occurred during Lech's direct examination, but only to defendants' inquiry into whether certain statements she made on the phone calls were false. But Lech did specifically object below on Rule 608(b) grounds to defendants' use of the recorded calls for the purpose of proving her purportedly untruthful character, which is the exact issue she now raises. Lech thereby preserved her evidentiary objection, and we review her 608(b) claim for abuse of discretion.

Rule 608(b) "bars the credibility-related use of some extrinsic evidence." United States v. Winchenbach, 197 F.3d 548, 557 (1st Cir. 1999). Under the rule, "extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for

truthfulness." Fed. R. Evid. 608(b). But the district court "may, on cross-examination, allow [such specific instances] to be inquired into if they are probative of [the witness's] character for truthfulness or untruthfulness." Id.; see also United States v. Abel, 469 U.S. 45, 55 (1984).

At trial, defendants played portions of recorded phone calls Lech made to her family while she was at WCC. They then asked her whether specific statements she made in those recordings unrelated to her medical care -- such as the basis for her probation violation, whether her then-boyfriend was living in a sober house, and her boyfriend's employment history -- were untruthful. Similarly, defendants played portions of recorded calls Lech made to her then-boyfriend. They asked her to confirm that, in those recordings, she discussed participating in or planning deceitful conduct unrelated to her medical care, such as lying to her family for her boyfriend, telling her boyfriend not to appear for an upcoming court date, and discussing how her boyfriend could obtain a false negative on a drug test.

The district court initially ruled that such use of the recorded calls violated Rule 608(b), but it invited defendants to file a motion on the issue. Defendants did so, arguing in part that the phone calls were not extrinsic because they already had been admitted into evidence, and that, even if the rule's prohibition on the use of extrinsic evidence applied, defendants

-14-

were permitted on cross-examination to inquire into Lech's untruthful statements on the calls. The district court then reversed its earlier ruling and determined that "the specific instances of untruthfulness reflected in the phone calls" were admissible, although it did not explain its reasoning.

We conclude that the district court ran afoul of Rule 608(b) when it allowed defendants to play the recordings before the jury. Defendants recognize on appeal, as they did below, that Lech's allegedly untruthful statements on the recordings were specific instances of her conduct and that they sought to use the recordings to attack Lech's character for truthfulness. Defendants argue, however, that the recordings were not extrinsic evidence because they were admitted and used during Lech's direct testimony and so are not covered by Rule 608(b).

But we have stated that "extrinsic evidence includes any evidence other than trial testimony." United States v. Balsam, 203 F.3d 72, 87 n.18 (1st Cir. 2000); see also 4 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 608.20[1] (2023) ("Evidence is 'extrinsic' if offered through documents or other witnesses, rather than through cross-examination of the witness himself or herself."). Indeed, in Balsam, we held that taped recordings of jailhouse phone conversations were inadmissible under Rule 608(b) because "the tapes were just such nontestimonial evidence." 203 F.3d at 87 n.18; see also United

-15-

States v. Sabean, 885 F.3d 27, 39 (1st Cir. 2018) (holding that the district court properly excluded an audio recording of a witness's testimony in a previous case when the recording was offered to impeach the witness's truthful character, given that such use would "ru[n] headlong into Federal Rule of Evidence 608(b)").[6] Here, Lech's statements on the recordings were not developed in her trial testimony and therefore were extrinsic. And the fact that Lech's counsel used portions of the calls for one purpose -- to bolster her testimony on direct examination -- does not answer the question of whether defendants' use of

---

[6] The Hampden County defendants offer different definitions of extrinsic evidence and contend that the recordings do not qualify. But their arguments do not stand up to scrutiny. First, relying on United States v. Ofray-Campos, 534 F.3d 1, 18 (1st Cir. 2008), defendants contend that extrinsic evidence is evidence other than that developed or introduced at trial. Ofray-Campos, however, did not involve Rule 608(b) and examined only whether a judge's response to a jury note during deliberations inappropriately exposed the jury to "extrinsic information," meaning "any outside influence," in violation of the defendant's Sixth Amendment rights. Ofray-Campos, 534 F.3d at 18-19 (quoting Patterson v. Colorado, 205 U.S. 454, 462 (1907)).

Second, defendants assert that the recordings were highly relevant to the litigation and that extrinsic evidence is evidence that is "'not relevant in the litigation to establish a fact of consequence,' i.e., evidence of a 'collateral matter.'" United States v. Boulerice, 325 F.3d 75, 82 n.5 (1st Cir. 2003) (quoting United States v. Andújar, 49 F.3d 16, 26 (1st Cir. 1995)). But whether the recordings were "highly relevant" has no bearing on whether they are extrinsic. The recordings went beyond Lech's own testimony during her cross-examination and are therefore extrinsic. See id. (contrasting evidence offered through documents or another witness, which is extrinsic, and testimony elicited on the witness's own cross-examination, which is not).

different portions of the calls for a different purpose violated Rule 608(b). See Fed. R. Evid. 105 (explaining that evidence may be admissible for one purpose but not another).

Defendants offer several reasons for why it was permissible for them to play the recordings, but we find none persuasive. First, the Hampden County defendants contend that Lech's calls were admissible as statements of a party opponent. See Fed. R. Evid. 801(d)(2)(A). But that rule provides only that an opposing party's statements are not hearsay. Fed. R. Evid. 801(d). It does not establish that the statements are admissible in violation of another rule. See Fed. R. Evid. 105.

Next, the Hampden County defendants argue that, on cross-examination, they were permitted to inquire into false statements Lech made on the recorded calls to demonstrate her allegedly untruthful character. Defendants are correct that Rule 608(b) allows a party to ask a witness about a specific instance of past conduct if it is probative of the witness's character for truthfulness, with the understanding that the party is then "stuck" with the witness's answer. See United States v. A.S., 939 F.3d 1063, 1072 (10th Cir. 2019) (quoting Seifert v. Unified Gov't, 779 F.3d 1141, 1154 (10th Cir. 2015)); see also Fed. R. Evid. 608(b); Abel, 469 U.S. at 55. So, when defendants asked Lech on cross-examination whether she lied during the phone calls, the rule did not render Lech's answers inadmissible. But the rule did

-17-

prohibit defendants from playing the recordings to introduce specific instances of her past conduct for the purpose of showing her alleged penchant for untruthfulness. See United States v. Mateos-Sanchez, 864 F.2d 232, 237 (1st Cir. 1988) (distinguishing between inquiry on cross-examination to demonstrate untruthful character, which is permissible, and presentation of physical evidence, which is not); Sabean, 885 F.3d at 39 (determining that the district court properly permitted the defendant to cross-examine a witness about testimony she had given in a prior case to impeach her general truthfulness while excluding an audiotape of that testimony). And that is what defendants did here. They told the district court they sought to play the calls because specific statements on the recordings were either false on their face or demonstrated that Lech lied on other occasions, all of which was "highly probative of her character for untruthfulness."

As their last line of defense, the Hampden County defendants contend that, even if the phone calls were extrinsic evidence, they were admissible because Rule 608(b) does not bar extrinsic evidence unless "the sole purpose" for offering the evidence was to prove a witness's character for untruthfulness. See Fed. R. Evid. 608(b) advisory committee's note to 2003 amendment. They note that both parties used Lech's calls for different purposes throughout trial. But defendants fail to offer important context for the authority upon which they rely. A

-18-

previous version of Rule 608(b) stated that extrinsic evidence could not be used to prove specific instances of conduct for the purpose of "attacking or supporting the witness' credibility." United States v. Epstein, 426 F.3d 431, 439 n.4 (1st Cir. 2005). The rule was later amended to substitute "character for truthfulness" for "credibility." Id. The advisory committee's note explains that the amendment intended to "clarify that the absolute prohibition on extrinsic evidence applies only when the sole reason for proffering that evidence is to attack or support the witness' character for truthfulness," thereby "leav[ing] the admissibility of extrinsic evidence offered for other grounds of impeachment (such as contradiction, prior inconsistent statement, bias and mental capacity)" to other rules. Fed. R. Evid. 608(b) advisory committee's note to 2003 amendment; see also United States v. Delgado-Marrero, 744 F.3d 167, 179 (1st Cir. 2014) (explaining that the amendment sought to make clear that the rule "exclude[d] extrinsic evidence of a witness's general propensity for honesty and truth, rather than . . . for other non-propensity purposes"). Critically, in defendants' own words, they sought to use the recordings in the manner challenged here to demonstrate Lech's "character for untruthfulness." Accordingly, Rule 608(b) applies.

Finally, von Goeler recognizes that Rule 608(b), "read narrowly," would prohibit a party from using previously admitted exhibits when cross-examining a witness about allegedly untruthful

conduct. But she states that a narrow construction would have been inefficient here. She asserts that, because the recorded calls were already in evidence, it was more efficient for defendants to use the recordings to establish that Lech made the statements, rather than proceed through the more extended process of using the recording to refresh Lech's recollection or impeach her. But the issue here is not that defendants played the recordings simply to confirm that Lech made certain statements in her phone calls. Rather, it is that defendants played the recordings to prove that Lech had lied in the calls, with the ultimate aim of depicting her as habitually untruthful.

To summarize, we conclude that the district court abused its discretion when it allowed defendants to play the recordings of Lech's calls to prove she had lied in the past and impugn her truthful character, in violation of Rule 608(b). We next turn to Lech's second evidentiary argument.

### 2. Exclusion of Zygmont's Testimony

Lech argues that the district court erred when it excluded testimony from her friend Alfred Zygmont about corroborating statements she made to him when he visited her at WCC. The parties agree that she preserved this objection, and that the abuse of discretion standard applies.

Below, Lech proffered that Zygmont would testify that, during his visits with her on December 26 and 28, 2013, "Lech

complained WCC medical staff were not paying attention to her, she was experiencing decreased fetal movement, felt that something was wrong, and that she thought she needed to go to the hospital." Lech contends that those statements were admissible as prior consistent statements under Federal Rule of Evidence 801(d)(1)(B)(i).

We have explained that under Federal Rule of Evidence 801(d)(1)(B)(i), "a witness's prior statement is excluded from the rule against hearsay -- and thus may be admissible -- 'when (1) the declarant testifies at trial and is subject to cross-examination; (2) the prior statement is consistent with the declarant's trial testimony; and (3) the prior statement is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive.'" United States v. Chiu, 36 F.4th 294, 300 (1st Cir. 2022) (quoting United States v. Jahagirdar, 466 F.3d 149, 155 (1st Cir. 2006)); see also Fed. R. Evid. 801(d)(1)(B)(i).

In rejecting the proffer, the district court focused on the third element -- that Zygmont's testimony must be offered to rebut an express or implied charge of recent fabrication levied against Lech. It concluded that there was no such charge of fabrication because on cross-examination, defendants did not challenge Lech on whether she told the medical providers about all of her pregnancy-related symptoms or whether she asked those

providers to go to the hospital but was ignored. In the district court's view, therefore, Lech was offering impermissible bolstering testimony. On appeal, the parties also focus primarily on this third element.[7] Accordingly, we turn to whether that element is satisfied here.

For this inquiry, we consider whether there is "some degree of fit between the alleged fabrication and the prior statement." Chiu, 36 F.4th at 301. To meet this standard, a charge of recent fabrication does not have to be "expressly made." United States v. Lozada-Rivera, 177 F.3d 98, 104 (1st Cir. 1999). But the person who seeks to introduce prior consistent statements, here Lech, must "point to specific questions" during the opposing party's examination "that suggest recent fabrication or bias." Id. "Merely appealing to credibility as a live issue will not do the trick." Id.; see also Chiu, 36 F.4th at 300-01 (examining whether the government challenged the defendant on the "specific subject of the rehabilitative, prior consistent statement" or launched only a generalized attack on his credibility); United States v. Wilkerson, 411 F.3d 1, 5 (1st Cir. 2005) (explaining

---

[7] The Hampden County defendants concede that the first two elements set forth in Chiu are satisfied, although von Goeler briefly suggests that Zygmont's testimony would not have been consistent with Lech's. She contends that Zygmont would have testified as to broad, generalized statements that Lech made to him, but that Lech's testimony was about specific medical issues she experienced. We reject this argument based on our review of the proffer and the record.

that prior consistent statements "must at least have some rebutting force beyond the mere fact that the witness has repeated on a prior occasion a statement consistent with [their] trial testimony" (internal quotation marks omitted) (quoting United States v. Simonelli, 237 F.3d 19, 27 (1st Cir. 2001))).

Lech easily satisfies that standard here. The trial record makes abundantly clear that defendants accused Lech of fabrication and that there is at least "some degree of fit" between Zygmont's testimony and the charge of fabrication it was offered to rebut. Chiu, 36 F.4th at 301. One of the central theories pursued by all defendants at trial was that the jury should believe the medical providers and their medical records, not Lech. As defendants recognized at oral argument before us, that theory required the jury to reject Lech's contrary testimony that she raised all her pregnancy-related concerns to the medical staff, who ignored her. Indeed, throughout trial, defendants compared (i) what Lech stated she told medical providers with (ii) what she discussed on her recorded calls with family members and her then-boyfriend to imply that her testimony about experiencing symptoms, reporting all those symptoms to medical staff, and requesting to go to the hospital was all fabricated.

For instance, during their cross-examination of Lech, defendants confirmed that she had just testified that she reported pregnancy-related symptoms to medical staff. They then played

recorded calls Lech had with her mother, brother, and then-boyfriend on the same day as those appointments and asked her to confirm that during those calls she did <u>not</u> mention anything about her pregnancy, the appointments, or the health of her baby, or that she needed to go to the hospital and medical staff refused to send her.

The implication of defendants' cross-examination was that Lech fabricated her testimony that she communicated concerns about her pregnancy to WCC medical staff. Defendants argued that the omissions in Lech's calls to family members made it unlikely that Lech experienced her symptoms at all or shared her symptoms with anyone, providers included, and more likely that she never told providers what she claimed.

In their opening statement, defendants confirmed that the purpose of using the recorded calls was to undermine Lech's testimony that she told providers her concerns about her pregnancy. So, too, in their closing argument, when defendants contended that Lech's pleas to the medical providers "are not supported by the medical records, and . . . are not supported by the recorded phone calls for a simple reason: Because they did not happen." In fact, at closing, defendants implored the jury, "[i]f [they were] having any doubt as to the v[e]racity of [defendants'] story," to "[d]ecide . . . whether [Lech's] phone conversations, the topics, the tone . . . are consistent with a woman who feels that her baby

is dying within her, who has been repeatedly begging to be sent to the hospital, and who has repeatedly been refused by every single medical provider she encountered over that 10-day period." To believe Lech, defendants asserted, the jury had to believe that, "in spite of [her] pressing concerns that she told [the jury] about, it is entirely reasonable that [she] made almost no mention of them" in her recorded conversations.

Zygmont's testimony would have rebutted defendants' theory that Lech fabricated either experiencing certain symptoms or sharing them with others (or both). As to Lech's symptoms, Zygmont would have testified that, when he visited Lech at WCC twice during the critical time period, Lech told him that she "was experiencing decreased fetal movement, felt that something was wrong, and that she thought she needed to go to the hospital." As to her communications with the providers, he would have testified that "Lech complained WCC medical staff were not paying attention to her." Lech contended that his testimony would have helped to establish that she was concerned about her pregnancy, communicated those concerns to her close friend, and felt that medical staff were dismissive of her. It also would have shown that Lech specifically mentioned experiencing decreased fetal movement multiple times and not just once. Further, a jury could have viewed Zygmont's testimony that Lech told him about her symptoms and thought she needed to go to the hospital as making it more

likely that Lech reported those symptoms to WCC staff and asked them to send her to the hospital. Accordingly, Zygmont's testimony would not have rebutted merely a broad attack on Lech's credibility. See Lozada-Rivera, 177 F.3d at 104; Chiu, 36 F.4th at 300-01. Rather, it would have rebutted the specific charge that she fabricated either her symptoms or her communication of those symptoms to providers. Chiu, 36 F.4th at 301.

Moreover, Zygmont's proposed testimony would not have been impermissible bolstering testimony. See Wilkerson, 411 F.3d at 5; Simonelli, 237 F.3d at 28. Its "rebutting force" was that, although Lech did not mention to some people in her life the concerns she said she raised to the providers, Lech told the one person who visited her while she was incarcerated at WCC that she was worried about her pregnancy. Wilkerson, 411 F.3d at 5 (citation omitted).

For these reasons, Zygmont's testimony was admissible as evidence of Lech's prior consistent statements under Rule 801(d)(1)(B)(i). See United States v. Washington, 434 F.3d 7, 15 (1st Cir. 2006) (finding that a prior consistent statement was properly admitted when the opposing party "had suggested that the entirety of [the declarant's] testimony on direct examination had been false," including testimony about the specific subject of the prior consistent statement (emphasis omitted)). The district court abused its discretion when it excluded his testimony. Its

determination that there was no charge of fabrication for that testimony to rebut simply does not reflect what occurred at trial.

Having found that the district court abused its discretion by allowing defendants to play recordings of Lech's calls to assail her character for truthfulness and by excluding Zygmont's testimony, we proceed to a harmless-error analysis.

### 3. Harmless-Error Inquiry

The district court's erroneous exclusion of Zygmont's testimony was not harmless as to the Hampden County defendants. The theme that they revisited at opening, at closing, in their cross-examination of Lech, and with virtually every fact witness was that the medical providers' account, not Lech's, was believable. In pursuit of that strategy, defendants emphasized that Lech's alleged silence about her pregnancy-related concerns on her recorded calls and her lack of corroborating evidence backed up their version of events and disproved Lech's. Indeed, defendants ended their closing argument by stating that "[t]he conflicts between . . . [Lech's] story and virtually all of the other evidence in this case" was "why such an important part" of the jury's job "is deciding who is telling the truth, whom do you believe is credible." In a similar manner, they contrasted Lech's testimony with that of the medical providers, which was "entirely corroborated" by the medical records and "all of the percipient witnesses."

Given that the case centered on a credibility battle between Lech and the medical providers, it cannot be harmless error to exclude corroborating testimony from the sole person who visited Lech at WCC during the relevant time period. Zygmont's testimony would have buttressed Lech's account, rebutted the argument that she never told anyone about all her symptoms, and made it more likely that she either discussed her concerns with providers or requested to be sent to the hospital.[8] See United States v. Awon, 135 F.3d 96, 101 (1st Cir. 1998), abrogated on other grounds by United States v. Piper, 298 F.3d 47 (1st Cir. 2002) (explaining that the impact of prior consistent statements is that they corroborate other evidence).

The district court's ruling excluded exactly the type of evidence that defendants emphasized was missing from Lech's case. It also excluded the only corroborating account from another witness that Lech sought to introduce. And because Zygmont's testimony was her sole corroborating account, it was not cumulative. Its value is precisely that it came from someone other than Lech.

---

[8] We note that the district court characterized Zygmont's testimony differently than the way that testimony was described in the proffer. The district court understood that Zygmont would testify that Lech told him she had relayed to medical staff her various pregnancy-related symptoms and asked medical staff to go to the hospital but was ignored. Zygmont's testimony would have had even more rebutting force -- and its exclusion would therefore have been more harmful -- when characterized in such a way.

Moreover, as Lech notes, the district court permitted Zygmont to testify about his visits but only as to what he observed about Lech, not what she stated to him. The exclusion of Lech's statements to Zygmont could have implied to the jury that Lech did not mention any issues with her pregnancy to him either. The jury therefore could have been misled into thinking that what was actually corroborating evidence undermined Lech's account.

To be sure, the accounts of seven medical providers and their notes conflicted with Lech's version of events. In addition, Lech had to contend with defendants' argument that it was inherently unlikely that providers ignored and failed to document some of Lech's pregnancy-related symptoms, while simultaneously responding to and documenting other symptoms that Lech agreed she reported. However, that backdrop only reinforces that the case hinged on competing credibility assessments. Lech's inability to offset defendants' account with evidence of her own is, in part, what helped defendants argue her account was false. And although Zygmont's testimony would not have changed Lech's omissions on the recorded calls, Lech explained at trial that she did not speak to her then-boyfriend or family members about her health because her boyfriend was not sympathetic and her family was dismissive of her concerns. Zygmont, by contrast, was the only person who visited her at WCC. The jury, if it had Zygmont's testimony, could have found that Lech was more likely to have confided in Zygmont about

her medical issues than the people she spoke with on the phone. Accordingly, his testimony was particularly important to rebutting the attacks on Lech's credibility.

Indeed, the exclusion of Zygmont's testimony is especially harmful when we consider it alongside defendants' use of the recorded calls to show Lech's alleged penchant for untruthfulness. We agree with Lech that, as a practical matter, it is necessary to evaluate the evidentiary rulings in combination. The jury would have reviewed the trial evidence holistically and could have weighed together -- and was encouraged by defendants to weigh together -- the evidence of Lech's alleged untruthfulness and the presence or absence of corroborating evidence for each side's version of events. The district court rejected Lech's proffer after defendants had spent part of their cross-examination attempting to show that Lech had a propensity to lie. With that ruling, Lech was deprived of the opportunity to introduce Zygmont's testimony to bolster her credibility, rebut the claim that she fabricated her account, and challenge defendants' account. At the same time, defendants were allowed to use statements unrelated to her medical care to show her alleged character for untruthfulness and to shore up their version of events. The two errors are mutually reinforcing.

Finally, Zygmont's testimony would have been relevant to Lech's contention that defendants unjustifiably delayed her access

to medical care. A jury could have found that his testimony helped show that Lech consistently noted decreased fetal movement over a period of days and that, as of December 26 and 28, she believed she needed to go to the hospital, but WCC medical staff did not send her there until the morning of January 2.

In considering the centrality of Zygmont's testimony to the trial and the prejudicial effect of its exclusion, see Nieves-Villanueva, 133 F.3d at 102, we conclude that it is not "highly probable that the error did not affect the outcome of the case" against the Hampden County defendants. McDonough, 452 F.3d at 19-20.[9] Because we determine that the exclusion of Zygmont's testimony was not harmless as to the Hampden County defendants and vacate the jury verdict as to those defendants on that ground, we need not determine whether the use of the recorded phone calls in violation of Rule 608(b) was also harmful.

## 4. Effect of the Evidentiary Rulings as to von Goeler

We reach a different conclusion about the impact of the evidentiary errors on the verdict as to von Goeler. Like the Hampden County defendants, von Goeler also attacked Lech's credibility. However, she offered an additional defense theory:

---

[9] Because we resolve Lech's claim on the ground that Zygmont's testimony was admissible as evidence of prior consistent statements and its exclusion was harmful, we need not address Lech's additional argument that the testimony was also admissible as evidence of her then-existing condition under Rule 803(3).

-31-

that Lech's stillbirth had already happened by the time von Goeler saw Lech on December 30, 2013.  She presented that theory at opening, in closing, and through expert testimony.  This theory relied on von Goeler's own expert, who estimated that Lech's placental abruption occurred one week before Lech's C-section on January 2, 2014, or on approximately December 26, 2013.  But it also relied on a concession by Lech's expert, who testified that it was "not likely" but "possible" that the placental abruption occurred 72 hours before the C-section.  Under that timeline, Lech's stillbirth would have occurred before Lech's December 30 appointment with von Goeler that formed the basis of her claims. Thus, if the jury credited Lech's own expert, it could have found that, even under Lech's version of events, von Goeler's actions did not cause Lech to lose her baby.  That lack of causation would have been fatal to Lech's claims against von Goeler.  As the district court's jury instructions made clear, each claim -- deliberate indifference, medical malpractice, and IIED -- required Lech to prove by a preponderance of the evidence that von Goeler's conduct was a but-for cause of Lech's harm. [10]  See Nieves-Villanueva, 133 F.3d at 102 (considering jury instructions

---

[10] Although the loss of Lech's baby may not be the only relevant harm as to Lech's IIED claim against von Goeler, Lech offers no argument on appeal that von Goeler's actions caused her some type of other, independent emotional distress that is sufficient to sustain an IIED claim.

in assessing the centrality of the evidence and any prejudicial effect on the jury's decision).

Although the parties did not discuss von Goeler's causation theory as part of their harmless-error arguments on appeal, we may affirm the judgment on any ground apparent in the record. United States v. George, 886 F.3d 31, 39 (1st Cir. 2018). Given the evidence supporting von Goeler's theory, which was the only defense theory that did not implicate Lech's credibility, the exclusion of Zygmont's testimony "cannot reasonably be understood as the pivotal evidence that tipped the verdict in favor of [von Goeler]." Gay, 660 F.3d at 64. Because we "cannot say that the [district court's evidentiary ruling] affected the outcome of the trial" as to von Goeler, we find that error harmless as to her. Nieves-Villanueva, 133 F.3d at 102.

### B. Summary Judgment

Next, we address Lech's argument that the district court should not have granted summary judgment to correctional officer Natalie Cruz on the deliberate indifference and IIED claims against her. We first address a threshold issue before turning to the relevant facts and legal standard.

Defendants argue that, even if the district court erred by granting summary judgment to Cruz on the deliberate indifference and IIED claims, any error was harmless given that the jury found that Cruz was not liable for negligence. We have declined to

-33-

"reenter the morass" of summary judgment when it is "perfectly clear that, even if a plaintiff's claim should not have been dismissed[,] . . . any such mistake was harmless, given the jury's verdict in the defendant's favor on other claims addressed to the very same factual circumstances." In re Nexium (Esomeprazole) Antitrust Litig., 842 F.3d 34, 62 (1st Cir. 2016) (cleaned up) (quoting Fite v. Dig. Equip. Corp., 232 F.3d 3, 6 (1st Cir. 2000)). Because we have determined that one of the evidentiary rulings discussed above affected the jury verdict, it is not "perfectly clear" that the verdict on the negligence claim renders the grant of summary judgment to Cruz on the deliberate indifference and IIED claims harmless. Id. Accordingly, we proceed to evaluate de novo the merits of the district court's entry of summary judgment. We begin by setting forth the facts related to the motion in the light most favorable to Lech consistent with record support. Johnson v. Johnson, 23 F.4th 136, 139 (1st Cir. 2022).

Lech interacted with Cruz the night before she was eventually transported to the hospital, where she was told her baby had passed away. At around 10 p.m. on January 1, 2014, Lech stood up to have her identification bracelet scanned as part of the facility's evening count. Lech felt a "gushing sensation" and a "wetness," in addition to abdominal cramping and bulging. She noticed that she was having vaginal bleeding and that her clothes were stained and wet. Lech used the intercom in her cell to call

-34-

the correctional officers' station, and Cruz answered. Cruz, who had received first-responder training as part of her job as a correctional officer, knew that Lech was pregnant both because it was clear to Cruz from Lech's appearance and because a list of prisoner information that Cruz possessed noted Lech's pregnancy. When she called Cruz, Lech told Cruz that her water had broken, that she believed she was in labor, and that she "need[ed] to go to medical or [she] need[ed] to go to the hospital."

WCC correctional officers like Cruz have two options for responding to inmates' medical needs: (1) they can "call medical [staff] and let them know the inmate is requesting medical," in which case the individual will be sent from their cell to the medical unit if the medical staff deems it necessary, or (2) they can "call a medical emergency via the radio," in which case medical staff will go to the individual's cell immediately to assess the individual. In responding to Lech, Cruz used the first option. Cruz told Lech that everything was fine, and that she would contact medical staff after finishing her count. After Cruz finished the count, which takes between two-and-a-half and three minutes to complete, and at some point between 10 p.m. and 10:19 p.m., Cruz called WCC medical staff. After speaking with medical staff, Cruz called Lech on the intercom and told her that medical staff wanted to know how serious her symptoms were and if she could wait until the morning to be seen. Lech told Cruz "why" she needed to see

medical, and her roommate shouted through the intercom that Lech "need[ed] to go [to] medical" and that "[Lech's] water broke." Cruz then spoke with the medical staff again, and they directed Cruz to send Lech to the medical unit. Cruz did so, and Lech was scanned out of the housing unit on her way to medical at 10:19 p.m. -- about twenty minutes after she first called Cruz. Lech walked to the medical unit with another WCC staff member.

In granting summary judgment to Cruz, the district court determined that "[t]he twenty-minute delay in transferring [Lech] from her cell to the medical unit while she was bleeding may have been negligence on Cruz's part, but it was not deliberate indifference." It also held that "[b]ecause the bar for IIED liability may be as high as the standard for a finding of deliberate indifference," Lech failed to show that Cruz's delay rose to the level of intentional infliction of emotional distress under Massachusetts law. We address the deliberate indifference and the IIED claim in turn.

### 1. Deliberate Indifference Claim

Prison officials violate the Eighth Amendment when they act with deliberate indifference to a prisoner's serious medical needs. Estelle v. Gamble, 429 U.S. 97, 104 (1976). To establish an Eighth Amendment violation, a prisoner must satisfy both an objective element, which requires proof of a serious medical need, and a subjective element, which requires a showing that a prison

official had a "sufficiently culpable state of mind" such that they were deliberately indifferent to that need. Leite v. Bergeron, 911 F.3d 47, 52 (1st Cir. 2018) (quoting Farmer v. Brennan, 511 U.S. 825, 834 (1994)).

The district court concluded that Lech had a serious medical need, and defendants do not contest that conclusion. We agree that Lech's medical needs were sufficiently serious at the time she interacted with Cruz to satisfy the objective element. "A medical need is sufficiently serious if it 'has been diagnosed by a physician as mandating treatment,' or is 'so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" Sosa v. Mass. Dep't of Corr., 80 F.4th 15, 27 (1st Cir. 2023) (quoting Zingg v. Groblewski, 907 F.3d 630, 635 (1st Cir. 2018)). On the evening of January 1, 2014, Lech had vaginal bleeding and had reported that her water broke and that she was in labor. Those symptoms are obvious enough that a layperson presented with them would recognize that Lech needed medical attention. Accordingly, the open issue is whether Lech has produced enough evidence for a jury to conclude that Cruz was deliberately indifferent.

Prison officials are deliberately indifferent when they "know[] of and disregard[] an excessive risk to inmate health or safety." Farmer, 511 U.S. at 836–37. To meet this standard, "prison officials must either deny needed medical treatment in

order to punish the inmate, or display wanton or criminal reclessness in the treatment afforded." Sosa, 80 F.4th at 27 (internal quotation marks omitted) (quoting Zingg, 907 F.3d at 635). That is, deliberate indifference may take the form of "'wanton' decisions to deny or delay care where the action is recklessness, 'not in the tort law sense but in the appreciably stricter criminal-law sense, requiring actual knowledge of impending harm, easily preventable.'" Watson v. Caton, 984 F.2d 537, 540 (1st Cir. 1993) (citations omitted). It is that form of deliberate indifference that Lech argues a jury could find here. Thus, to survive summary judgment, she must present enough evidence for a factfinder to conclude that, in taking about twenty minutes to transfer Lech to the medical unit, Cruz acted with "wanton disregard" for Lech's serious medical needs -- that is, Cruz knew Lech faced a substantial risk of serious harm and yet failed to take reasonable measures to prevent it. Zingg, 907 F.3d at 635.

On the particular facts here, given Lech's own framing of her request, what Cruz knew at the time, and Cruz's multiple calls to Lech and medical staff within the twenty-minute period, we conclude that the district court did not err in granting summary judgment to Cruz. Lech herself asked Cruz to send her to the medical unit or to the hospital. After finishing her count, Cruz responded to Lech's request by calling the medical unit and went back and forth with the medical unit and Lech. Critically, no

evidence indicates that Cruz knew Lech had a high-risk pregnancy. See Burnette v. Taylor, 533 F.3d 1325, 1331 (11th Cir. 2008) (explaining that each defendant's subjective awareness of a risk of harm must be assessed individually). The evidence shows only that Cruz knew Lech's water had broken and Lech believed she was in labor. Within that context, neither Cruz's completion of all the steps needed to send Lech to the medical unit within twenty minutes of Lech's request nor Cruz's decision to call the medical unit, as opposed to using the radio to announce a medical emergency, is sufficient to support a finding that Cruz wantonly delayed care.

To be sure, "short[] delays" in providing medical care "may . . . constitute a constitutional violation if injuries are sufficiently serious." Youmans v. Gagnon, 626 F.3d 557, 564 (11th Cir. 2010). As Lech points out, in other cases, courts have found sufficient evidence to permit a finding of deliberate indifference by prison officials when medical care was delayed for fewer than twenty minutes. But cases with shorter or comparable delays involved prison officials' knowledge of readily apparent life-threatening injuries. See Beauford v. Mesa County, 35 F.4th 1248, 1267 (10th Cir. 2022) (finding that waiting ten minutes to seek medical assistance when prison official was not sure if prisoner was breathing may constitute deliberate indifference); Bradich ex rel. Est. of Bradich v. City of Chicago, 413 F.3d 688, 691-92 (7th

Cir. 2005) (same when three prison officials waited ten minutes to seek help after prisoner's attempted hanging and in that time provided unhelpful assistance); Bozeman v. Orum, 422 F.3d 1265, 1273 (11th Cir. 2005), abrogated on other grounds by Kingsley v. Hendrickson, 576 U.S. 389 (2015) (same when officers knew prisoner was either unconscious or not breathing (or both) and failed to summon help for fourteen minutes); Tlamka v. Serrell, 244 F.3d 628, 632-35 (8th Cir. 2001) (same when correctional officers forced prisoners who were providing CPR to another prisoner who had suffered a heart attack to stop and then failed to approach the prisoner or provide CPR for a period of up to ten minutes). As we noted above, because Lech did not dispute that Cruz was unaware of her high-risk pregnancy, no such readily apparent life-threatening injury was presented here.

Relying on Giroux v. Somerset County, 178 F.3d 28 (1st Cir. 1999) and Goebert v. Lee County, 510 F.3d 1312 (11th Cir. 2007), Lech also argues that Cruz's failure to enter her cell and investigate her condition is enough to support her deliberate indifference claim. But, again, the defendants' conduct in those cases is different than Cruz's conduct. In Giroux, we explained that the evidence showed a correctional-officer defendant was "aware of a high probability that [a prisoner] was vulnerable to attack from another inmate but took no action despite that awareness." 178 F.3d at 33. And in Goebert, a jail official

-40-

failed to act in response to a pregnant woman's complaint that she had been leaking fluid for more than nine days for no reason other than that he "automatically disbelieve[d] all inmate statements about medical care." 510 F.3d at 1316-19, 1327-29. Here, by contrast, Cruz completed the steps to arrange for medical assistance for Lech within twenty minutes of Lech's request.

We therefore affirm the district court's grant of summary judgment to Cruz on the deliberate indifference claim.

## 2. IIED Claim

We must next determine whether the district court correctly ruled that Cruz's conduct failed to rise to the level required for an IIED claim. "The standard for making a claim of intentional infliction of emotional distress is very high." Polay v. McMahon, 10 N.E.3d 1122, 1128 (Mass. 2014) (citation omitted). To sustain an IIED claim under Massachusetts law, a plaintiff must show "(1) that [the defendant] intended, knew, or should have known that [their] conduct would cause emotional distress; (2) that the conduct was extreme and outrageous; (3) that the conduct caused emotional distress; and (4) that the emotional distress was severe." Id. Massachusetts courts have interpreted "extreme and outrageous conduct" to mean behavior that is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Roman v. Tr. of Tufts

-41-

Coll., 964 N.E.2d 331, 341 (Mass. 2012) (quoting Foley v. Polaroid Corp., 508 N.E.2d 72, 82 (Mass. 1987)).  In determining whether conduct rises to that level, a factfinder is entitled to "put as harsh a face on the actions of the [defendant] as the basic facts would reasonably allow."  Richey v. Am. Auto. Ass'n, 406 N.E.2d 675, 678 (Mass. 1980).

We determine that it was not error for the district court to conclude that Cruz's conduct fails to rise to the level of extreme or outrageous.  The fact that Cruz, who did not know that Lech had a high-risk pregnancy, engaged in all the steps to send Lech to medical within twenty minutes of Lech's request and did so rather than call a medical emergency via radio is insufficient to permit a jury to find that she engaged in conduct that exceeds "all possible bounds of decency" and is "utterly intolerable in a civilized community."  Polay, 10 N.E.3d at 1128 (citation omitted).

We therefore affirm the district court's grant of summary judgment to Cruz on the IIED claim.

## IV. CONCLUSION

For these reasons, we affirm in part and vacate and remand in part.  The parties shall bear their own costs.

-42-